# APRIL, 1912.

RAILROAD COMMISSION OF TEXAS v. GALVESTON CHAMBER OF

## COMMERCE.

### No. 2366.   Decided April 3, 1912.

#### 1.—Railroad Commission—Powers Conferred.

The Railroad Commission was constituted an independent department of the Government which should represent the interest of the people and the railways and to the accomplishment of that purpose the courts will contribute a just and liberal interpretation of the law defining its powers.  Rev. Stats., art. 4562.  (P. 115.)

#### 2.—Same—Judicial Control—Burden and Degree of Proof.

While the discretion committed to the Commission in fixing railway rates is subject to control by the judicial power of the State (Rev. Stats., art. 4565, 4566) the statute so guards the Commission from improper interference that the courts must regard its actions, when within the limits of its delegated powers, as being the result of a purpose to do justice between all parties and as having resulted in just and correct action until it is shown, by clear and satisfactory evidence, to be otherwise.  Railroad Commission v. Weld & Neville, 96 Texas, 409.  (P. 115.)

#### 3.—Same—Clear and Satisfactory Evidence.

The language "clear and satisfactory evidence" (Rev. Stats., art. 4566) limits the power of courts in setting aside rates, etc., to cases in which it may be established by evidence which leaves no reasonable doubt in the judicial mind that the rate or rule is unjust and unreasonable.  Willis v. Chowning, 90 Texas, 617.  (Pp. 115, 116.)

#### 4.—Same.

The motives or purposes of the Railroad Commission are not subject to review.  The result and its effect upon the rights of railroads and shippers mark the limit of judicial inquiry; and it is not sufficient that the court can see no reason for differences; they must be able clearly to see a valid reason why they should not exist.  (P. 116.)

#### 5.—Railroad Commission—Rates—Houston Galveston Differential.

Findings of fact by the trial court on the question of reasonableness of rates prescribed by the Railroad Commission in "General Tariff of Class Rates No. 3, sec. 3" (order of February 10, 1902, and amendments thereto) are considered and held not to support a judgment enjoining the Commission from enforcing the "differentials" provided by such order as a basis for rates of shipment from or to common points and the cities of Houston and Galveston as being unjust or unreasonable to the people of the latter city.  (Pp. 116-118.)

#### 6.—Freight Rates—Natural Advantages.

The fact that a locality enjoys natural commercial advantages by reason of its location and water transportation, should not cause adverse discrimina-

tion nor favorable consideration in fixing rates of freight by rail. The question of competition and its influence upon rates is peculiarly one for the Commission. (P. 117.)

**7.—Case Distinguished.**

The ruling in Railroad Commission v. Galveston Chamber of Commerce, 51 Texas Civ. App., 476, distinguished from present case. (Pp. 118, 119.)

Error to the Court of Civil Appeals for the Third District, in an appeal from Travis County.

Action by the Galveston Chamber of Commerce against the Railroad Commission of Texas. Defendants had judgment in the trial court. On appeal this was reversed and judgment rendered for plaintiff, whereupon appellees obtained writ of error.

*J. P. Lightfoot,* Attorney-General, *Jas. D. Walthall,* Assistant, *Andrews, Ball & Streetman, Gregory, Batts & Brooks,* and *Williams & Stedman,* for plaintiffs in error.—No complaint against any rate, rule or regulation of the Railroad Commission is tenable unless the complainant pleads and proves by clear and satisfactory evidence that the rate, rule or regulation complained of is unreasonable and unjust *per se* as applied to the complainant. Railroad Commission Law, Rev. Stats., arts. 4562-4576; Railroad Commission v. Weld & Neville, 96 Texas, 394; Texas & P. Ry. Co. v. Interstate Commerce Com., 162 U. S., 940; Interstate Commerce Com. v. L. & N. R. R. Co., 73 Fed., 409; Interstate Commerce Com. v. G. W. Ry. Co., 209 U. S., 108; Mo. Pac. Ry. Co. v. Bartlett, 81 Texas, 42; Boston Chamber of Commerce v. Lake Shore, etc., Ry. Co., 1 I. C. Rep., 436; 11 I. C. Rep., 13; Freight Bureau of Cin. v. Railway Co., 7 I. C. Rep., 180; Kauffman Milling Co. v. Railway Co., 4 I. C. Rep., 417; Banner Milling Co. v. Railway Co., 13 I. C. Rep., 31; Washburn-Crosby Co. v. Railway Co., 13 I. C. Rep., 40; Johnston v. Railway Co., 13 I. C. Rep., 605; Rhienander Paper Co. v. Railway Co., 13 I. C. Rep., 633; Anthony Gro. Co. v. Railway Co., 13 I. C. Rep., 605; Doesel-Boettcher Co. v. Railway Co., 12 I. C. Rep., 220; Howard Mills Co. v. Railway Co., 12 I. C. Rep., 258; Banner Milling Co. v. Railway Co., 14 I. C. Rep., 318; Williams v. Railway Co., 16 I. C. Rep., 428; Southern Bit. Co. v. Railway Co., 17 I. C. Rep., 300; Montgomery Freight Bureau Case, 17 I. C. Rep., 521; Trammel v. Dinsmore, 102 Fed., 794; Staenerson v. Railway Co., 69 Minn., 353; Prentice v. Atlantic, etc., Line, 211 U. S., 226; Texas & P. Ry. Co. v. Interstate Commerce Com., 162 U. S., 197; Interstate Commerce Com. v. Railway Co., 209 U. S., 108; Interstate Commerce Com. v. Alabama Mid. Ry. Co., 69 Fed., 227, 74 Fed., 715, 168 U. S., 144; Interstate Commerce Com. v. Railway Co., 190 U. S., 273; Railway Co. v. Behlmer, 175 U. S., 648; Interstate Commerce Com. v. B. & O. Ry. Co., 145 U. S., 263; Interstate Commerce Com. v. C., B. & Q. Ry. Co., 186 U. S., 320; East Tenn., etc., Ry. Co. v. Interstate Commerce Com., 181 U. S., 1; Interstate Commerce Com. v. Railway Co., 120 Fed. 934; Interstate Commerce Com. v. Railway Co., 122 Fed., 800; Gamble R. Com. Co. v. Railway Co., 168 Fed., 161; Denaby M. C. Co. v. Railway Co., 26 Am. & Eng. R. R. Co., 293; Liverpool C. T. Assn. v. Rail-

way Co., 45 Am. & Eng. R. R. C., 216; Baxendale v. E. C. Ry. Co., 93 Eng. Common Law Rep., 75; Garton v. B. & E. Ry. Co., 101 Eng. Common Law Rep., 153; Cowden v. Pacific Coast Steamship Co., 94 Cal., 470, 28 Am. State Rep., 142; Avinger v. South Carolina Ry. Co., 29-S. C., 265, 13 Am. State Rep., 716; Johnston v. Pensacola & Perdido Ry. Co., 16 Fla., 666; Scofield v. Railway Co., 43 Ohio St., 612; Fitchburg Ry. Co. v. Gage, 12 Gray, 398.

Before any rate, rule or regulation of the Commission can be successfully attacked under proper pleadings and proof, the complainant must show, by clear and satisfactory evidence, that the rate, rule or regulation complained of is unreasonable and unjust to it or them, or, in other words, the issue must be proved by the complainant beyond a reasonable doubt. 17 Cyc., 144; Interstate Commerce Com. v. Alabama Mid. Ry. Co., 166 U. S., 144; Railway Co. v. Bartlett, 81 Texas, 44; Barnes v. Ullmann, 71 Texas, 537; Greenleaf on Ev., sec. 2; Denaby Main Colliery Co. v. Manchester etc., Railway Co., 3 Railway and Canal Traffic Cases, 426; Phipps v. London & Northwestern Railway (1892), 2 Q. B. D., 229; Cincinnati, N. O. & Tex. Pac. Ry. v. Interstate Commerce Com., 162 U. S., 184, 194; Texas & Pacific Railway v. Interstate Commerce Commission, 162 U. S., 197, 235.

The court cannot inquire into the motives prompting the Commission in making a rate, rule or regulation. The only inquiry subject to judicial examination is the effect of such rate, rule or regulation when brought in question by proper pleadings and testimony. Railroad Commission v. Weld & Neville, 96 Texas.

The Court of Civil Appeals erred in holding that under Articles 4564, 4565 and 4566 of the Revised Statutes, defendants in error have the right to maintain and prosecute this suit upon the grounds and for the reasons furnishing the causes of complaint alleged by them. Gulf, C. & S. F. Ry. Co. v. Railroad Commission, 102 Texas, 353; Weld & Neville v. Railroad Commission, 96 Texas, 394; Dallas Freight Bureau v. M., K. & T. Ry. Co., 12 I. C. Rep., 427; Texas & P. Ry. Co. v. Interstate Commerce Com., 162 U. S., 197; Reagan v. Trust Co., 154 U. S., 362; Interstate Commerce Com. v. B. & O. R. Co., 145 U. S., 263; Parsons v. C. & N. W. Ry. Co., 167 U. S., 447.

*Lewis & Phillips,* for defendant in error.—Each locality is entitled to its natural advantages and the Railroad Commission is without power to make discriminations for the purpose of offsetting the natural and other advantages possessed by Galveston; the lower rates which Galveston obtains by virtue of deep water are the fruits of its natural advantages. Railroad Commission v. Galveston Chamber of Commerce, 115 S. W., 99; Judson on Interstate Commerce, art. 184; Interstate Com. v. B. & O. R. R. Co., 145 U. S., 263; Eau Claire Board of Trade v. Chicago M. & S. Ry. Co., 4 I. C. Rep., 77.

The trial court erred in not finding that the class rates complained of in respect to the differential on Galveston are unreasonable and beyond the power of the Commission to make. Rev. Stats., arts. 4652, 4574; T. & P. Ry. Co. v. Interstate Commerce Com., 162 U. S.,

197; Railroad Commission v. Galveston Chamber of Commerce, 115 S. W., 95; Commercial Club of Omaha v. C. R. L. Ry. Co., 6 I. C. Rep., 647; Daniels v. Chicago Ry. Co., 6 I. C. Rep., 458, 479; Kinsall v. A. T. & S. F. Ry. Co., 8 I. C. Rep., 608; Milk Producers' Assn. v. D. & W. Ry. Co., 7 I. C. Rep., 92, 164; Ill C. R Co. v. Interstate Commerce Com., 206 U. S., 426; Carr v. Northern T. R. Co., 9 I. C. Rep., 1, 11; Freight Bureau v. Cincinnati Ry. Co., 6 I. C. Rep., 592; Business Men's League v. A. T. & S. F. Ry. Co., 9 I. C. Rep., 318, 358; N. O. Cot. Exch. v. Ill. C. R. Co., 3 I. C. Rep., 534; Consolidated Forwarding Co. v. S. P. Ry. Co., 10 I. C. Rep., 590; In Re Class and Commodity Rates, 11 I C. Rep., 238; Farrar v. Southern Ry. Co., 11 I. C. Rep., 632; Ex Parte Koehler, 31 Fed., 315; In Re L. & N. R. Co., 1 I. C. Rep., 31, 79; Grain Shippers' Assn. v. Ill. C. R. Co., 8 I. C. Rep., 158; F. & P. R. Co. v. Interstate Commerce Com., 162 U. S., 197.

MR. CHIEF JUSTICE BROWN delivered the opinion of the court.

This action was instituted by the Galveston Chamber of Commerce and some citizens against the Railroad Commission of Texas under the following articles of the Revised Statutes:

"Art. 4565.  If any railroad company or other party at interest be dissatisfied with the decision of any rate, classification, rule, charge, order, act or regulation adopted by the Commission, such dissatisfied company or party may file a petition setting forth the particular cause or causes of objection to such decision, act, rate, rule, charge, classification or order, or to either or all of them, in a court of competent jurisdiction in Travis County, Texas, against said Commission as defendant.  Said action shall have precedence over all other causes on the docket of a different nature, and shall be tried and determined as other civil causes in said court.  Either party to said action may appeal to the appellate court having jurisdiction of said cause, and said appeal shall be at once returnable to said appellate court, at either of its terms, and said action so appealed shall have precedence in said appellate court of all causes of a different character therein pending; provided, that if the court be in session at the time such right of action accrues, the suit may be filed during such term and stand ready for trial after ten days' notice."

"Art. 4566.  In all trials under the foregoing article the burden of proof shall rest upon the plaintiff, who must show by clear and satisfactory evidence that the rates, regulations, orders, classifications, acts or charges complained of are unreasonable and unjust to it or them."

No questions arise upon the pleadings, they were appropriate and sufficient on both sides.

The case was tried in Travis County before the Honorable Chas. A. Wilcox, district judge, without a jury.  The judge made a comprehensive and very clear statement of the facts found, upon which he entered judgment for the Commission, from which an appeal was taken by the plaintiffs to the Court of Civil Appeals of the Third District, which reversed the judgment of the District Court and rendered judgment for the plaintiffs, Chamber of Commerce and

others, enjoining the enforcement of the tariffs, orders and regulations complained of. The Honorable C. H. Jenkins delivered the opinion of the court, filing a finding of facts which is a condensation of the more elaborate statement by the trial judge. No objection has been made to the findings of either court. We believe that a better comprehension of the case can be had from the statement of the trial court in connection with that of the Court of Civil Appeals, therefore, from both statements we restate the case as follows:

Galveston is situated on an island and has a population of 37,000. It has deep water and the largest sea going vessels enter its harbor, making its commerce domestic and foreign, of imports and exports extensive and important. In the city are firms doing large and lucrative business in various lines, among others, cotton factors, who buy cotton and ship it to other markets reached by the seas. Seven railroads enter Galveston from the mainland of Texas, two of which do not pass through Houston, to-wit: the Gulf, Colorado & Santa Fe and the Gulf & Interstate. From Houston the following railroads reach Galveston: I. & G. N. R. R.; The G. H. & H. R. R..; The G. H. & S. A. R. R.; The Trinity & Brazos Valley R. R.; "The G. & I. R. R. is owned by the G. C. & S. F. R. R. Co." Houston is reached by these railroads: "T. & N. O. from the east; B. S. L. & W. from the east; H. E. & W. T. from the northeast; H. & T. C., I. & G. N., T.·& B. V., and M. K. & T. from the north; G. H. & S. A. from the west; S. A. & A. P. from the west; G. C. & S. F. Ry. Co. from the southwest over its branch from Alvin; St. L. B. & M. operating its trains over the G. C. & S. F. tracks, and the G. H. & H. operating from Houston to Galveston."

We copy the following conclusions of fact filed by the trial judge:

"I find from all points on the G. C. & S. F. Railroad the direct mileage over said road to Galveston is less than through Houston; this is true of the main line and also of the East Texas line of this company, where the shipments are made by Beaumont over the Gulf and Interstate Railroad. However, from Brenham and all points north of Brenham on the main line of this railroad, the distances by combination over other lines of railway are less to Galveston through Houston than over this company's own line. On all other lines entering Galveston the mileage to Galveston is shorter through Houston than by any other combination, with the exception of all points on the St. L. B. & M. Ry. via Algoa, and the Santa Fe, all points on the Mexican National Ry. via the St. L. B. & M. Ry. and Algoa, all points on the G. H. & S. A. west of Rosenberg via that point and the Santa Fe, all points on the S. A. & A. P. via Wallis and the Santa Fe and from all lines south of the G. H. & S. A. and S. A. & A. P. in that territory west of Rosenberg and Wallis.

"I further find that much the greater portion of the cotton and other freight carried to and from Galveston is carried by the railways by way of Houston; and that by reason of shorter mileage and the location of the railroads, that is the natural route for all such traffic, except that carried over the Santa Fe.

"10. The Gulf & Interstate Railroad reaches Galveston by way

of a ferry from Port Bolivar, its trains being ferried a distance of five miles, which service is more expensive than the operation of trains over the roadbed of said company for a like distance.

"11. All the other railroads entering Galveston cross Galveston Bay on a bridge about two miles in length. Other bridges have been used, but have been washed away by storms and only the present bridge was rebuilt, at a cost of $145,000.00. For the use of this bridge the roads pay an interest rental and a proportion of the cost of maintenance. The present bridge is a standard wooden bridge of its kind and is adequate to carry the traffic over it with the exception that its use by the several roads causes delay in traffic and consequent expense. The bridge, however, is not considered a permanent structure in that it is a wooden bridge and is subject to damage or destruction by storms.

"12. There is at present under construction a causeway over the bay which will be used by all of the railroads except the G. & I. The G. C. & S. F., the G. H. & H., and the G. H. & S. A. are under contract to pay one-half of the cost; the total expense of these three railroads for their one-half of cost of construction and for completing their tracks across the causeway will be $800,000.00.

"13. On the railroad crossings between Houston and Galveston it is necessary to operate a number of interlocking devices, ranging in initial cost of from $4500.00 to $10,000.00 or $12,500.00 each, and costing from $150.00 to $250.00 per month each for maintenance and operation. Two drawbridges are also in use, one near Houston and one on the Galveston bridge. With the exception of drawbridges at the T. & N. O. bridges over the Trinity and Neches Rivers, it is not shown that drawbridges are necessary elsewhere in the State. It is also shown that there are a number of interlocking devices on the T. & N. O. on the divisions east and west of Houston, and that interlocking devices are in use in Houston, Dallas and all large railroad centers.

"14. The expense paid by railroads for labor for operating trains is greater per mile between Houston and Galveston, for the reason that Houston is a division point, the Houston-Galveston division being approximately fifty miles in length, train crews are paid on a basis of a run of 100 miles, the compensation for the shorter run being the same as for 100 miles. The cost of one crew for 100 miles is $22.83, the same cost that is incurred by the railroads for a crew operating between Houston and Galveston.

"15. The absence of grades, however, makes it possible for the railroads to handle about double the amount of freight between Houston and Galveston with a single crew as can be ordinarily handled with the same crew in the interior.

"16. Expense of switching and handling cars at Galveston, not including the terminal railway charges on export traffic, is 18c per car at Galveston and 15c per car at Houston and less at interior points, at small division points the cost being from one to two cents.

"17. The cost of coal for the operation of the average train between Houston and Galveston, considering the distance as 50 miles,

is twenty dollars, while to carry the same amount of freight for a like distance in the interior would cost $23.00.

"18.  The country between Houston and Galveston is low and level and on account of moisture, character of the soil and the difficult drainage, the roadbeds of the railway are more expensive to maintain than for the same distances in the interior, where the country is rolling.

"19.  Taking into consideration Findings No.......I am unable to compare with accuracy the cost to the railway of carrying freight between Galveston and Houston with the cost, including all services, for the same service on the average fifty miles in the interior; however, I am inclined to the opinion that the actual cost, under present conditions, is slightly greater between Houston and Galveston than for the same distance in the interior.

"20.  While it is shown by the evidence that on the T. & N. O. railroad between Houston and Beaumont and between Houston and Glidden the railroads carry more tons of freight per mile of road during a year than is carried per mile of road between Houston and Galveston, yet I conclude on the whole facts that the amount of freight per mile of road carried in a year is greater between Houston and Galveston than is carried over the average fifty miles of railroad in the interior.

"21.  On the other hand, the cars engaged in carrying cotton and other export traffic to Galveston largely make the return trip empty, the portion of cars hauled back empty from Galveston being larger than from Houston and other interior points.

"22.  Taking into consideration all the above findings, I conclude that the service of the railways between Houston and Galveston is not a like service as that for the same distance in the interior and that some greater compensation to the railroads operating between Houston and Galveston would be justified.

"23.  I find that the Railroad Commission of Texas had adopted and promulgated its certain orders known as General Tariff of Class Rate No. 3 and its certain orders known as Commodity Tariffs, of the dates and tenor substantially as alleged by plaintiffs, all of which several orders are now in effect, except as hereinafter set out. All of said orders and the amendments thereto are in evidence and are here referred to and adopted as a part of these findings. That by said General Tariff of Class Rates No. 3, the Railroad Commission has divided all kinds of freight transported by railroad companies between points in Texas (saving and excepting certain kinds of freight covered by what is known as Commodity Tariffs), into ten classes, known, respectively, as Nos. 1, 2, 3, 4 and 5, and A, B, C, D and E.  Nos. 1 to 4, inclusive, relate to shipments of less than car loads, and Nos. 5 and A to E, inclusive, relate to carload shipments; and has divided the State of Texas into two territories, known, respectively, as 'Common Point Territory,' and 'Differential Territory,' and has divided such respective territories substantially as set out in plaintiff's petition.  That by said order as amended and now in force, said Railroad Commission has fixed the freight rates to be charged for transporting commodities belonging to the various classes

between all points in Texas in such 'Common Point Territory,' graduating such charges, in accordance with certain fixed distances, up to and including 245 miles, and providing that for a shipment going over 245 miles, no matter what the distance might be, no greater freight rates should be charged than for the maximum amounts fixed in such schedule of rates, to-wit, 80c per 100 lbs. on class 1, and ranging down to 17c per 100 lbs. on class E. It is provided that on a shipment of such commodities between points in 'Common Point Territory' passing over two or more lines of railroad under the same management and control the same rates are to be charged as where the shipment is over a single line of railroad. When the shipment is made over two or more lines of railroad in 'Common Point Territory' not under the same management and control, certain freight rates in excess of those above mentioned are to be charged for certain distances, provided the maximum of such two line rate should not exceed the maximum for shipments over a single line. '

"That by said order as amended and now in force it is provided that the freight rate on such ten classes on shipments between Galveston, Port Bolivar, Velasco, and Texas City, and points in Texas not otherwise provided for, should be made by adding to the rates applying between Houston and such points the following amounts in cents per 100 lbs., viz: on Class 1, 7c; Class 2, 6c; Class 3, 5c; Class 4, 3c; Class 5, 3c; Class A, 3c; Class B, 3c; Class C, 2c; Class D, 2c; Class E, 2c; the charges in excess of the Houston rate are commonly known as 'Differentials,' and are charged on all shipments between Galveston and all points in 'Common Point Territory,' and between Galveston and all points in the western portion of the State designated as 'Differential Territory,' except shipments to or from points on the St. Louis, Brownsville and Mexico Railroad, and to and from certain other points not necessary to set out.

"That by the Commodity Tariffs complained of, certain rates are charged between Galveston, and points in 'Common Point' and 'Differential Territory' in excess of the rates charged between Houston and such points, on the commodities covered by such respective tariffs, the rates being made on the same plan as the Class Rates are made, the difference being that the amount of the rate, the maximum distance, and the amount of the Differential vary with the respective commodities.

"The rate on cotton between points in 'Common Point Territory' for the maximum distance of 160 miles or over, is 49c and the differential on cotton applying between Houston and Galveston is 6c per 100 lbs., making the total rate to Galveston, Port Bolivar and Texas City from points in 'Common Point Territory' in excess of 160 miles from Houston, 55c per 100 lbs.

"24. That practically all of the articles of commerce handled and sold by the jobbers and wholesalers of Galveston, Houston and other cities of the State, are included in the Class Rates above set out, and the freight rate for the transportation of such articles within the State is fixed by said Class Rates. That Houston, Galveston and many other cities in the State of Texas do a large business in the articles covered by said Class Rates.

"25.   That in the practical operation of such Class Rates, up to certain distances from Galveston, the freight rates on the several classes and commodities mentioned in plaintiff's petition are less from Galveston than for equal distances from Houston or other points in 'Common Point Territory,' for certain farther distances the rates are the same, and for farther distances the Galveston rates increase over the Houston rates until the increase equals the amount of the differentials complained of.   For instance, on first class, the rates to or from Galveston are less than for like distances to or from Houston up to 260 miles; from 260 to 265 miles the rates are the same; beyond 265 miles the rates to or from Galveston exceed the rates to or from Houston, the excess reaching the full amount of the differential, or 7c, at 295 miles, the full excess of 7c applying on all distances over 294 miles.   From any particular given point, the rate to or from Galveston is higher than the rate from the same point to Houston.

"The same is true with reference to the other classes and commodities with the difference that the distances for which Galveston pays a less rate the same rate and greater rates than Houston, vary, such distances on all the classes, and some of the commodities, being less than those shown under Class 1, the table introduced in evidence in connection with Mr. Askew's testimony as set out in the Statement of Fact, showing such distances under the Class Tariffs is correct, and is here referred to.

"26.   I find that the larger portion of the business of the wholesale merchants and jobbers of Galveston is transacted within the distances where the rates are less to and from Galveston than those applying between Houston and other points in Texas equally distant.

"27.   I find that much the greater portion of the business of the wholesale merchants and jobbers of Houston is transacted in the territory where the rates to Houston are greater than are the rates for equal distances from Galveston.

"28.   I find that much the larger portion of the merchandise and commodities handled by the merchants and jobbers of Galveston is received from Atlantic seaboard and foreign points from which the freight rates to Galveston under normal conditions are less by the amount of the differentials than the rates from the same point to Houston.   However, for the last 18 months competition between the lines of ships running from New York to Galveston and to Texas City has greatly reduced the water rates from New York, so that under present conditions on shipments destined to Houston or to interior points the freight is shipped to a local agent at Galveston or Texas City upon the water rates and re-billed over the railroads to Houston or other places of destination on the local rates from Galveston or Texas City to such points.   Under the present conditions Galveston receives this freight, passing through Galveston, at a less rate in proportion to other cities than under conditions formerly existing; but it is shown by the evidence that under present conditions freight may be shipped from New York through Texas City to Houston on the same rate as is paid on the same freight from the same point to Galveston.

"29. A portion of the goods and commodities handled by Galveston people are received from interstate points over the railways. A portion of the goods so received reaches Galveston on a less freight rate than the same goods reach Houston or other interior points; some portion of them reach Houston and Galveston at the same rate, but at a less rate than to other interior points; and a portion of them reach Galveston, Houston and all other points in 'Common Point Territory' at the same rate.

"30. I find that the maximum freight rate on cotton to Houston is 49c per 100 lbs., and the rate from Houston to Galveston is 6c per 100 lbs., the maximum rate to Galveston from all 'Common Point Territory' points being 55c per 100 lbs., this rate to Galveston applying for all distances as much as 211 miles from Galveston.

"31. That about 2/3rds of the cotton crop of the State is produced in the territory from which the maximum rate to Galveston exceeds the maximum rate to Houston.

"32. I find that practically all of the cotton produced in Texas is shipped to port of Galveston by water to Atlantic seaboard and foreign points and pays a total rate of 55c to Galveston, whether stopped locally or delivered at ship-side. Much the larger portion is carried to Galveston by the railroads, but a considerable portion of the cotton concentrated in Houston is carried to Galveston by barges over Buffalo Bayou.

"33. The cotton when shipped from the local point of production is permitted to be stopped in transit at Compress points for the purpose of being compressed, or concentrated, the compress fees being paid by the railroads out of the freight charges, and the through freight rate is not affected by the stop for compression or concentration.

"34. It is important and necessary for buyers purchasing cotton for resale, or for shipment to foreign or interstate points, to concentrate large quantities of cotton at one point, in order that they may grade and classify it and select certain quantities of the same grades for the purpose of filling their orders. The stoppage of cotton at compress points enables them to get together quantities of cotton for the purposes above named. But sometimes the requisite quantities cannot be gotten together at the interior compresses and it becomes important to concentrate larger quantities and this is done by concentration at Houston or Galveston, at which points shipment from various sections of the State converge.

"35. Many buyers of cotton store large stocks of cotton for the purpose of holding the same for sale or for delivery at some future time. A considerable quantity of cotton is also shipped to cotton factors at Houston and Galveston to be stored and sold direct to the large buyers.

"Dallas, Fort Worth, Waco, San Antonio and other points in the State are large cotton markets, but it is advantageous in the concentration and storage of cotton, that it be done at a point near shipside, in order that it may be more accessible to the ship when ready to be moved. Galveston and Houston are each large cotton markets, with large and adequate facilities for the concentration, storage and

handling of cotton, have a large number of cotton buyers and cotton factors, and each of these places handles locally large quantities of cotton. Houston handles the largest quantity and has perhaps larger facilities than Galveston.

"Cotton stored in Galveston can be loaded on the ship within a few hours' notice, and cotton stored in Houston may be shipped to Galveston and be placed in shipside upon 24 hours' notice.

"36.   Cotton shipped from the interior, whether shipped direct or stopped in Houston, reaches shipside on a total of 55c freight rate, a charge of $1.75 per car made by the Galveston Wharf Terminal Company for delivery to the wharves, the charges being paid by the railroad carrying the cotton out of the freight charges.

"37.   Cotton delivered locally in Galveston is switched to point of destination if such point be on its own line; if not, a charge of $2.00 and in some cases $2.15 per car is paid by the G. H. & H. Ry. and from $1.50 to $2.50 by the other roads to the railroad switching the cotton to destination, such charge being paid out of the freight rate.

"38.   Cotton delivered to the compresses and warehouses in Galveston has to be drayed to the ship at the expense of 12½, per bale, which is paid by the owner of the cotton.

"39.   An owner of cotton shipping cotton to be handled at Galveston locally has to pay 12½c more; that is, the drayage charge, to get his cotton to shipside, than is paid on cotton not handled locally in Galveston.

"40.   Under the Railroad Commission rules cars loaded with cotton destined for shipside, are allowed to be detained in Galveston, before unloading, for four or five days without paying demurrage. The average detention of cars at Galveston loaded with export cotton is about three and a half days.

"41.   Cars loaded with cotton for local delivery at Galveston are allowed to be detained two days; the average detention of cotton cars for local delivery at Galveston is about two and a half days.

"42.   I find that the concentration and compression rules contained in Tariff No. 1e, complained of in paragraph 9 of plaintiff's petition, have heretofore been cancelled by the Railroad Commission, and are not in effect.

"43.   With reference to Commodity Tariff No. 3-a complained of, I find that cotton-seed products and other commodities covered by said tariff are consumed locally to some extent for the purpose of feeding live stock. There are factors in Galveston handling cotton-seed products. A cotton-seed oil mill was formally operated in Galveston, but it is not now operated. Large quantities of cotton-seed products passed through the port of Galveston, the evidence not disclosing to what extent, if any, such products are shipped to interstate points over the railroads.

"44.   There are rice mills operated in Galveston, a portion of the rice being received from near-by coast points by water, the larger portion of it coming by rail. Large quantities of rice are exported from Galveston, and some rice and rice products moved from Galveston by rail.

"45. Houston has extensive cotton-seed oil mills and rice mills, most of the products moving to Galveston for export or to points within which the rates from Houston are more than are the rates for equal distances from Galveston.

"46. I find with reference to commodity tariff No. 10-a, fixing the rates on wool, that there are no wool markets in either Houston or Galveston, the markets being located in the wool producing sections. Practically no wool is consumed in Texas, it being exported through the port of Galveston.

"47. With reference to commodity tariff No. 15-a complained of: The evidence does not disclose that can fruits and vegetables are produced in Texas sufficient to be moved in carload lots; the movements under this tariff are similar to those under the Class Tariffs on carload shipments hereinbefore set out.

"48. The movement of shipments under Commodity tariff No. 17-a, complained of, are similar in most instances, to the movements under Class Tariffs hereinbefore set out.

"49. With reference to commodity tariff No. 25-a, the evidence discloses no movement into Galveston by rail, but a considerable movement out of Galveston, and discloses no movement into or out of Houston or other points.

"50. The findings with reference to Class Tariffs apply to Commodity Tariff No. 26-a and No. 42.

"51. With reference to Commodity Tariff No. 33. The sugar and molasses consumed in Texas comes principally from New Orleans. The rate on sugar from New Orleans to Galveston is 3c less than to Houston, 3c being the amount of the differential. More than double the amount of these commodities are distributed from Galveston than from Houston; the evidence does not disclose the movement from other State points.

"52. With reference to Commodity Tariff No. 36, on cement: The evidence shows that large importations of cement are received at Galveston over water routes, and distributed by rail, and a considerable quantity is received by rail. For the year ending June 30, 1909, Galveston received 2,010,000 lbs. by rail, and distributed 16,-428,000 lbs.; Houston received 9,448,000 lbs., portion of it moving through Galveston; Houston distributed 3,297,100 lbs. Seventy per cent of the cement received by Galveston came in on the water rate of 5c per 100 lbs.

"The evidence shows that there are a number of cement plants in the interior of the State doing a large business.

"53. With reference to Commodity Tariff No. 43, I find that there is practically no consumption of hides in Texas, practically all moving to interstate and foreign points. The evidence shows the following movements for the year ending June 30, 1909.

"Out of Houston to eastern points via Galveston and water lines, 1,056,000 lbs.; out of Houston to Galveston proper, 1,075,400 lbs.; out of Houston to New Orleans, all rail, 2,632,000 lbs.; out of Houston for other State points, 1,091,400; into Houston, 2,410,691 lbs.; out of Galveston to Houston, 392,000 lbs.; out of Galveston to Texas City, 20,000 lbs.; into Galveston, 4,253,122 lbs.

"54. With reference to Commodity Tariff No. 45, the evidence discloses the following movement for the year ending June 30, 1909 :. Out of Galveston, 15,511 tons; into Galveston, by rail, 8,248 tons; out of Houston, 3,608 tons; into Houston, by rail, 1,480 tons.

"55. With reference to circular No. 3190, complained of, I find that Texas City is about six miles nearer Houston by rail than is Galveston. That by reason of being nearer to the basing point, any practical application of the rates on commodities moving on continuous mileage rates, a lower rate may be made from Texas City than from Galveston to certain possible points within the maximum mileage; but the evidence does not disclose that there is any actual movement to or from such possible or assumed points. This circular has no effect on freight moving under the Class or Commodity Tariffs where the differential is applied.

"I find upon consideration of all the facts that the respective rules, regulations and rates of the Railroad Commission of Texas do not subject the plaintiffs in this cause, or the City of Galveston as a locality, to any undue or unreasonable prejudice or disadvantage, as alleged, and do not give to Houston or other localities in the interior any undue preference or advantage over Galveston, and that said rates, rules and regulations are not unreasonable or unjust to the complainants in this cause."

Prior to 1889 the Legislature of this State regulated freight charges and passenger fares by statute, specifying a maximum rate for transportation of property and fixing passenger fares at a definite sum per mile. There was much dissatisfaction with the operation of the railroads and for a number of years different measures were proposed by members of the Legislature, which culminated in 1889 in submitting to the people this amendment to the Constitution, which was adopted by a vote of the people in 1890:

"Sec. 2. Railroads heretofore constructed or which may hereafter be constructed in this State are hereby declared public highways, and railroad companies common carriers. The Legislature shall pass laws to regulate railroad freight and passenger tariffs, to correct abuses, and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and enforce the same by adequate penalties and to the further accomplishments of these objects and purposes, may provide and establish all requisite means and agencies invested with such powers as may be deemed adequate and advisable."

In pursuance of that amendment the Legislature, in 1891, enacted a law creating a Railroad Commission, giving to it ample powers over the railroads of the State to enable it to correct existing abuses and to prevent them in the future.

In order to present this question properly it will be necessary to consider the matter from the standpoint of the authority of the Commission over the subject of rates, rules and regulations for the government of the railroads, as well as the authority of the courts to revise the acts of the Commission.

After providing for the organization of the Railroad Commission, its duties were prescribed and its authority defined, as follows:

"Art. 4562. The power and authority is hereby vested in the Railroad Commission of Texas, and it is hereby made its duty, to adopt all necessary rates, charges and regulations to govern and regulate railroad freight and passenger tariffs, the power to correct abuses and prevent unjust discrimination and extortion in rates of freight and passenger tariffs on the different railroads in this State, and to enforce the same by having the penalties inflicted as by this· chapter prescribed through proper courts having jurisdiction.

"1. The said Commission shall have power, and it shall be its duty, to fairly and justly classify and subdivide all freight and property of whatsoever character that may be transported over the railroads of this State into such general and special classes or subdivisions as may be found necessary and expedient.

"2. The Commission shall have power, and it shall be its duty, to fix to each class or subdivision of freight a reasonable rate for each railroad subject to this chapter for the transportation of each of said classes and subdivisions.

"3. The classifications herein provided for shall apply to and be the same for all railroads subject to the provisions of this chapter.

"8. The Commission shall have power and it shall be its duty from time to time, to alter, change, amend or abolish any classification or rate. established by it when deemed necessary; and such amended, altered or new classifications or rates shall be put into effect in the same manner as the originals.

"9. The Commission may adopt and enforce such rules, regulations and modes of procedure as it may deem proper to hear and determine complaints that may be made against the classifications or the rates, the rules, regulations and determinations of the Commission.

"10. The Commission shall make reasonable and just rates of charges for each railroad subject hereto for the use or transportation of loaded or empty cars on its road; and may establish for each railroad or for all railroads alike reasonable rates for the storing and handling of freight and for the use of cars not unloaded after forty-eight hours' notice to the consignee, not to include Sundays.

"11. The Commission shall make and establish reasonable rates for the transportation of passengers over each or all of the railroads subject thereto, which rates shall not exceed the rates fixed by law. The Commission shall have power to prescribe reasonable rates, tolls or charges for all other services performed by any railroad subject hereto.

"12. It shall be the duty of each and every railway subject to this chapter to provide and maintain adequate, comfortable and clean depots and depot buildings at its several stations for the accommodation of passengers, and said depot buildings shall be kept well lighted and warmed for the comfort and accommodation of the traveling public; and all such roads shall keep and maintain adequate and suitable freight depots and buildings for the receiving, handling, storing and delivering of all freight handled by such roads; pro-

vided, that this shall not be construed as repealing any existing laws on the subject.''

It is apparent that it was the purpose of the Legislature to confer upon the Railroad Commission ample powers and a liberal discretion over this important matter. Indeed, the character and importance of the business of transportation of freight and passengers in the extensive and varied territory placed under the control of the Commission could not be successfully handled by fixed rules of law. The varied interests to be served and the many difficulties to be overcome, as well as conflicting interests to be properly adjusted demanded flexible rules. The Railroad Commission was constituted an independent department of the Government which should represent the interests of the people and the railroads and to the accomplishment of that purpose the courts will contribute a just and liberal interpretation of the law.

While it is true that much discretion is committed to the Commission, it is not wholly without control, but is subject to the judicial power of the State, as expressed in this provision of the law:

''Art. 4565. If any railroad company or other party at interest be dissatisfied with the decision of any rate, classification, rule, charge, order, act or regulation adopted by the Commission, such dissatisfied company or party may file a petition setting forth the particular cause or causes of objection to such decision, act, rate, rule, charge, classification or order, or to either or all of them, in a court of competent jurisdiction in Travis County, Texas, against said Commission as defendant. Said action shall have precedence over all other causes on the docket of a different nature, and shall be tried and determined as other civil causes in said court. Either party to said action may appeal to the Appellate Court having jurisdiction of said cause, and said appeal shall be at once returnable to said Appellate Court, at either of its terms, and said action so appealed shall have precedence in said Appellate Court of all causes of a different character therein pending; provided, that if the court be in session at the time such right of action accrues, the suit may be filed during such term and stand ready for trial after ten days' notice.

''Art. 4566. In all trials under the foregoing article the burden of proof shall rest upon the plaintiff, who must show by clear and satisfactory evidence that the rates, regulations, orders, classifications, acts or charges complained of are unreasonable and unjust to it or them.''

The foregoing statute so guards the Commission from improper interference that the courts must regard its actions, when within the limits of its delegated powers, as being the result of a purpose to do justice between all parties, and as having resulted in just and correct action until it be shown by clear and satisfactory evidence to be otherwise. R. R. Commission v. Weld & Neville, 96 Texas, 409. The language, ''clear and satisfactory evidence,'' limits the power of courts in setting aside rates, etc., to cases in which it may be established by evidence which leaves no reasonable doubt in the judicial mind that the rate or rule is unjust and unreasonable. Willis v. Chowning, 90 Texas, 617. It is true that this attributes to the

work of the Commission a high degree of verity, but it is the plain language of the law, and is no doubt a wise provision.

It is not within the language nor the spirit of the law which authorizes the courts to review the action of the Railroad Commission that any court should investigate the methods adopted by the Commission in fixing its rates nor the motives or purposes which prompted such action. The result and its effect upon the rights of railroads and shippers mark the limit of judicial inquiry.

The Honorable Court of Civil Appeals having reversed the judgment of the District Court and having entered judgment against the Commission, these questions are presented for our consideration: (1) Did the Court of Civil Appeals err in rendering judgment? (2) If the Court of Civil Appeals erred in entering judgment against the Commission, shall this court reverse that judgment and affirm the judgment of the trial court, or shall the case, in that event, be remanded to the District Court for another trial?

We find it quite difficult to review the action of the Honorable Court of Civil Appeals, since the able and exhaustive opinion discusses in a general way facts and principles without definitely stating the facts or the grounds upon which its judgment rests. Upon referring to the judgment of that court we find that certain rates as specified in certain schedules, etc., are annulled, from which we are not able to ascertain the particular ground upon which any one is annulled or what provision of the law is held to have been violated by the promulgation thereof. We conclude that we can best review that court's judgment by discussing the leading and what we conceive to be the principal contentions made by the plaintiff against the rates complained of.

1. It is claimed that the differential between Houston and Galveston is unjust and unreasonable to the people of Galveston, but we have sought in vain for the facts which establish the claim of injustice or unreasonableness. It is not claimed that the Commission was without authority to prescribe the differential rate. The principal complaint is the application of the differential to the shipment of cotton from the interior to Galveston. Practically all cotton that goes to Houston finally goes to Galveston and is from there shipped to some other part of the United States or to some foreign country.

Let us illustrate the practical effect of the differential by comparing the movements of one shipment by a buyer of each city thus: A, of Houston, ships one hundred bales of cotton from some interior point to that city at the rate of forty-nine cents per hundred pounds. It may be unloaded and compressed. He then reships to Galveston, paying six cents per hundred pounds, making fifty-five cents per hundred pounds as the total cost of shipment from the initial point. B, of Galveston, purchases in the same market one hundred bales of cotton and ships it to Galveston, direct, at fifty-five cents per hundred pounds; wherein is B injured by this transaction? Each party pays the same rate for the same service. Suppose that A should start his one hundred bales of cotton to Liverpool, he may unload at Houston or other compress point, and, after compressing, reship on his railroad bill of lading which calls for delivery to a ship bound

for a foreign port.  The railroad company must pay for compressing and wharfage at Galveston, so that delivery may be made to shipside in accordance with the contract.  For this A pays fifty-five cents per hundred pounds, neither more nor less.  If B should start his one hundred bales to Liverpool likewise and takes a bill of lading for delivery to the ship, for which he pays fifty-five cents per hundred pounds, and no more; he may unload at Houston or elsewhere and re-compress and then resume the journey to Liverpool.  The railroad company pays for compressing and delivery to shipside the same as for A.  Both place their cotton on shipboard at the same cost.  Wherein is the discrimination?  If B should ship his cotton to Galveston to be delivered at his or some other warehouse, then the railroad company discharges its contract, and B wishes to forward the cotton to Liverpool he must deliver it to the ship at his own cost.  If A should ship his cotton to a cotton firm at Galveston, to be there stored, when he should resume its shipment to Liverpool he must pay for delivery to the ship the same as B; each man pays the same rate for like service.

It seems to be in the mind of the attorneys for defendant in error that Galveston is entitled by law to some favor because of its location and water transportation.  The advantage exists and that position should not cause adverse discrimination nor favorable indulgence.  The benefit of access to the high seas belongs to the people of all the States and may be and no doubt has been used by the Commission for the general good.  The bayou affords some competition with the railroads between Houston and Galveston, and, if it were sufficient, might force the railroads to seek lower rates to Galveston, but Galveston would have no right to demand lower rates on the railroads.  This question of competition and its influence upon rates was and is peculiarly for the Commission.  We deem it unnecessary to discuss that phase of the case.

It is claimed that as applied to the commodity tariff the differential is injurious and unjust to the people of Galveston.  The facts as found by the trial court and clearly illustrated by the learned judge who wrote the opinion of the Court of Civil Appeals show that the rate per hundred pounds on freight leaving Galveston or Houston is so regulated that for the first fifty-eight miles from Houston it is thirty cents per hundred pounds, while for the first fifty-eight miles from Galveston the rate is twenty cents.  The rate on freight from Galveston gradually increases in its relative proportion to that fixed for Houston until at the distance of 263 miles each rate reaches 80c per hundred pounds, beyond which distance nothing is added to the Houston rate, but the rate from Galveston is increased until 294 miles is reached, when the rate for Galveston is equal to the Houston rate, plus the differential.  These rates apply to shipments from and to the two cities.  It is apparent that Galveston has the advantage in rates for 263 miles and is at a slight disadvantage for about thirty miles.  The judge of the trial court found that the lower rates to and from Galveston applied to the territory in which its merchants and other business men do their largest business, but that the lower rate to and from Houston applied to the territory in which its mer-

chants do the least business. From this statement of facts it does not appear that the plaintiffs or any interest in the city of Galveston has suffered injury. The Commission had authority to prescribe the rates and this court will not disturb them, except upon clear and satisfactory evidence that they are *unjust* and *unreasonable* to the complainants. It is not sufficient that we can see no reason for the differences, we must be able to clearly see a valid reason why the rates should not exist in that form.

Judge Jenkins says: "We see no practical difference as to rate-making between the Gulf, Colorado & Santa Fe Railway, and the St. Louis, Brownsville & Mexico Railway, the rates on which were involved in Railroad Commission v. Galveston Chamber of Commerce, reported in 51 Texas Civ. App. 476 115 S. W., 94. As to the rates complained of herein, the Gulf, Colorado & Santa Fe may be treated as not entering Houston at all. No freight over the main line of this road passes through Houston, and we see no reason why its rates to Galveston should be based on Houston, nor why it should be compelled to charge a higher rate to Galveston over certain distances, than it is permitted to charge to other places on a like freight for like distances." (137 S. W., 752.) The judge does not state the facts with regard to rates on the Gulf, Colorado & Santa Fe road and we find nothing in the findings of fact of the trial court to warrant the conclusion that the rates on that railroad are unreasonable or unjust. With great respect for the learned judge who delivered the opinion of the Court of Civil Appeals, we repeat that courts cannot set aside rates made by the Commission because the reason for an apparent discrimination is not evident; the reason why it should not be as made by the Commission must be made clear beyond a reasonable doubt to justify courts in setting aside rates which the law authorizes that body to make.

We are unable to say from the facts presented that any rate on the Santa Fe violates the provisions of Article 4574, Revised Statutes, therefore, we deem it unnecessary to discuss that question.

In the case of Railroad Commission v. Galveston Chamber of Commerce, 51 Texas Civ. App., 476, 115 S. W., 94, Chief Justice Key of the Court of Civil Appeals of the Third District, said: "The uncontroverted testimony in this case shows that there is practically no difference in distance from Galveston to any point on the St. Louis, Brownsville & Mexico Railway, and from Houston to the same point on the same road, and that there is no difference in the cost of transporting freight to or from Galveston or Houston to any point on that road. It also appears with equal certainty that Houston and Galveston are commercial rivals. In fact, while this suit was brought by individuals as plaintiffs, and against the members of the Railroad Commission as defendants, it is frankly conceded to be in the main a contest between localities, each of which is a city doing a large volume of commercial business. This being the situation, as shown by clear and undisputed testimony, and it being shown by like testimony that the acts of the Railroad Commission complained of require materially higher freight rates to be paid on shipments of freight to and from Galveston than are paid for similar shipments to and

from Houston to points on the railroad referred to, it seems to us that the orders and rates complained of must be held to give an undue and unreasonable preference and advantage to Houston over Galveston." No such conditions are shown in this case. We are of the opinion that the facts in the present case do not support the judgment of the Court of Civil Appeals.

The findings of fact by the trial court have not been objected to. Those facts, in our opinion, wholly fail to meet the requirements of Article 4566, Revised Statutes, that the evidence must show the rate to be unreasonable and unjust beyond a reasonable doubt, and as a matter of law the plaintiffs failed to show any right to a judgment. Therefore, the trial court correctly rendered judgment refusing to interfere with the rates. It is ordered that the judgment of the court of Civil Appeals be reversed and that the judgment of the District Court be affirmed.

*Reversed and judgment of District Court affirmed.*