**Jessie Rene JONES, et al., Appellants,**

v.

**HOUSTON GENERAL INSURANCE COMPANY A/K/A Equitable General Insurance Company, Appellee.**

**No. 10–86–161–CV.**

Court of Appeals of Texas, Waco.

Aug. 6, 1987.

Rehearing Denied Sept. 10, 1987.

Don Prager, Law Offices of Don Prager, P.C., Fort Worth, for appellants.

Harvey L. Frye, Jr., Peebles, Betty & Brantley, Fort Worth, for appellee.

## OPINION

THOMAS, Justice.

This is a suit for death benefits under the Texas Worker's Compensation Act based on a policy issued under the assigned-risk provisions of the Texas Insurance Code. *See* Tex.Rev.Civ.Stat.Ann. art. 8306, § 8 (Vernon Supp.1987); Tex.Ins. Code Ann. art. 5.76 (Vernon Supp.1987). The court found in a non-jury trial that the policy had been cancelled by the insurance carrier prior to the employee's death because of the employer's failure to pay interim premiums on the policy and to file payroll reports. Therefore, the court entered a take-nothing judgment in favor of the carrier. The beneficiaries of the deceased employee claim on appeal that the cancellation was ineffective because the policy could only be cancelled by the Assigned Risk Pool and not by the carrier. The judgment will be affirmed.

Eddie Jones, an employee of John Hutchins d/b/a Hutchins Grass Company, was killed on September 14, 1977, while he was in the course and scope of his employment. His wife and children filed a claim for death benefits under the Worker's Compensation Act. After the claim was denied by the Industrial Accident Board, they filed suit in the district court against Houston

General Insurance Company, the carrier which had issued an assigned-risk worker's compensation insurance policy to Hutchins on March 8, 1977.[1] The court originally entered a summary judgment in favor of Houston General, which was later reversed. *See Jones v. Houston General Ins. Co.*, 624 S.W.2d 363 (Tex.App.—Waco 1981, no writ). The court then entered a take-nothing judgment in favor of Houston General following a trial before the court. Among the court's findings were that Houston General had cancelled the policy on June 22, 1977, because of Hutchins' failure to pay interim premiums and to file payroll reports. Therefore, it concluded that Houston General was not liable because Hutchins was not insured under the policy on September 14, the date of Jones' death.

Jones' beneficiaries contend that the cancellation was ineffective because the policy could only be cancelled by or under the authority of the Assigned Risk Pool. They also charge that the cancellation clause of the policy conflicted with the Assigned Risk Pool's rules and regulations governing cancellation. The essential question under these points is whether a carrier can cancel an assigned-risk policy without a prior "directive" from the Assigned Risk Pool.

Provisions relating to assigned-risk worker's compensation insurance are contained in article 5.76 of the Texas Insurance Code. References to article 5.76 are to the text as it existed on June 22, 1977, the date of cancellation of Hutchins' policy. Section (g) authorized the Board of Insurance Commissioners to prescribe the form of assigned-risk policies. Section (d) required the carrier to issue an assigned-risk policy on the form prescribed by the Board. The evidence conclusively established that Hutchins' policy was on a standard form approved and prescribed by the Board.

The policy contained the following cancellation provision:

15. Cancellation: ... This policy may be cancelled by the company by mailing to the insured at the address shown in this policy written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy. Delivery of such written notice ... by the company shall be equivalent to mailing.

The court found that Houston General complied with this provision when it mailed a written cancellation notice to Hutchins on June 7, 1977, at the address listed in the policy, notifying him that cancellation would be effective on June 22. However, Jones' beneficiaries assert that the cancellation provision in the policy conflicted with the Assigned Risk Pool's rules and regulations governing cancellation.

Section (e) of article 5.76 required the Assigned Risk Pool to adopt such rules as was necessary to implement the assigned-risk provisions. These rules and regulations included the following:

II. SERVICING COMPANIES

[T]he Governing Committee [of the Assigned Risk Pool] shall select not less than Six Members to perform all *necessary functions* as carriers for any risk assigned to it....

\*　\*　\*　\*　\*　\*

IV. EXTENSION OF COVERAGE AND EXAMINATION OF EMPLOYEES

\*　\*　\*　\*　\*　\*

(b) [T]he designated [carrier] shall forthwith proceed to issue a policy ... and extend any and all such services as may be *requisite.*

(Emphasis added). James Johnston, the manager of the Assigned Risk Pool in 1977, testified by deposition that cancellation of an assigned-risk policy for non-payment of interim premiums was included within a carrier's "necessary functions" and con-

---

1. The policy was actually issued by Equitable General Insurance Company, the predecessor in interest to Houston General Insurance Company, but references will be made to Houston General for the sake of convenience.

sidered one of its "requisite" services. He also stated that the Assigned Risk Pool had always interpreted article 5.76 and its rules and regulations as authorizing the carrier to cancel for non-payment of premiums without any prior approval or action on the part of the Pool.

■■■ Article 5.76, which created and conferred administrative powers on the Assigned Risk Pool, must be liberally construed to carry out the legislature's intent. *See Railroad Commission v. Galveston Chamber of Commerce,* 105 Tex. 101, 145 S.W. 573, 580 (1912). Rules and regulations adopted by the Assigned Risk Pool had to be in harmony with the general objectives of article 5.76 to be valid. *See Gerst v. Oak Cliff Savings and Loan Association,* 432 S.W.2d 702, 706 (Tex.1968). Furthermore, these rules and regulations must be interpreted and construed like a statute. *Lewis v. Jacksonville Bldg. & Loan Ass'n,* 540 S.W.2d 307, 310 (Tex. 1976).

■■■ Rules of statutory interpretation are well known. The ultimate goal of all statutory interpretation and construction is to determine legislative intent. *Crimmins v. Lowry,* 691 S.W.2d 582, 584 (Tex.1985). A court must determine legislative intent from a statute's language by reading it as a whole. *Id.* The existence or non-existence of legislative intent may be inferred from the fact that a certain provision is missing from a statute. *See Freels v. Walker,* 120 Tex. 291, 26 S.W.2d 627, 630 (1930). A limitation may not be read into a statute by implication, unless it is apparent that the limitation was intended by the legislature but left unexpressed. *Spears v. City of San Antonio,* 110 Tex. 618, 223 S.W. 166, 169 (1920): *North Common School Dist. v. Live Oak County Bd.,* 145 Tex. 251, 199 S.W.2d 764, 766 (1946). Generally, an agency's interpretation of a statute that it is obligated to enforce is entitled to weight, unless its interpretation is contrary to the statute's words. *See Citizens Nat. Bank of Paris, Ill. v. Calvert,* 527 S.W.2d 175, 180 (Tex.1975).

■■■ Article 5.76 did not expressly prohibit a carrier from cancelling an assigned-risk policy or limit the right of cancellation to the Assigned Risk Pool. Because the statute did not contain such restrictions, one can reasonably infer that the legislature did not intend to apply such limitations. *See Freels,* 26 S.W.2d at 630. Furthermore, this court cannot add such restrictions by implication because one cannot say, considering the language of the statute as a whole, that the legislature obviously intended such restrictions to apply. *See Spears,* 223 S.W. at 169.

■■■ Likewise, the Assigned Risk Pool's rules and regulations did not expressly prohibit a carrier from cancelling a policy or restrict the right of cancellation to the Assigned Risk Pool. However, Jones' beneficiaries argue that such restrictions can be inferred from a juxtaposition of the following provisions of the Procedural Handbook:

23. A. *Regular Collection Procedure (Including Cancellation for Non-Payment of Interim Premium)*

Interim premium payments, as distinguished from deposit premium payments, shall be made by the insured, direct to the Servicing Company, not to the Pool Office. The Servicing Company shall send a regular collection letter, with copies to the Pool Manager and Producer of Record when an interim payment has not been made within 20 days after the end of the reporting period. This letter will include information that the policy will be cancelled if report and premium payments are not received within ten days. Special rules for "automatic" non-payment cancellation, and "final cancellation" without reinstatement or revocation of cancellation in certain situations are set out in B and C below.

B. *Automatic Cancellation Basis:*

After an Assigned Risk has either given the Servicing Company an "Insufficient Fund" check or been sent collection letters by the Servicing Company on three different occasions within a policy period because of the risk's failure to pay interim premium payments within the normal 20 day grace period, the risk shall be placed on what is

known as an "automatic cancellation basis". This means:

(a) The Pool Manager will write a letter to the insured, with copies to the Servicing Company and Producer of Record, advising that the Servicing Company will issue a cancellation notice without further directive from the Pool Manager, if any interim premium payment is not received in the Servicing Company's office within ten days, rather than the normal 20 days.

(b) *In the event premiums are not paid to the Servicing Company within ten days, the Servicing Company will issue a cancellation notice automatically, without further directive from the Pool Manager.*

(c) Once applied this automatic cancellation basis continues on renewal policies or reassignment until changed by the Pool Manager.

(Emphasis added in B.(b)). They contend that the cancellation of Hutchins' policy was governed by the procedure outlined in paragraph 23.A. Because paragraph 23.-B.(b) expressly authorized the carrier to "automatically" cancel a policy "without further directive from the Pool Manager", they reason that paragraph 23.A. must, by logical implication, have required the Assigned Risk Pool to send a "directive" to the carrier before it could cancel the policy. Thus, they argue that the cancellation of Hutchins' policy was ineffective because the Assigned Risk Pool had to, but never did, direct Houston General to cancel the policy.

The arguments advanced by Jones' beneficiaries must be rejected for several reasons. First, the form of Hutchins' policy had been prescribed by the Board of Insurance Commissioners. The plain language of the policy's cancellation clause authorized Houston General to cancel without any prior written notice or directive from the Assigned Risk Pool. This procedure did not conflict with article 5.76.

Second, the cancellation provision in Hutchins' policy did not conflict with the Assigned Risk Pool's rules and regulations or with the cancellation procedure in the Procedural Handbook. The Procedural Handbook recognized in paragraph 15 that assigned-risk policies which required as little as "10 days advance notice in event of cancellation [were] acceptable." Paragraph 23.A. of the Procedural Handbook governed cancellation for non-payment of interim premiums unless an employer had been placed on an "automatic cancellation basis" under paragraph 23.B. Cancellation of Hutchins' policy was governed by paragraph 23.A. because there was no evidence that he had ever given Houston General a "hot check" or had been sent three collection letters under paragraph 23.A. The purpose of the letter from the Assigned Risk Pool notifying an employer that he had been placed on an "automatic cancellation basis" was to formally advise him that he had lost his rights under paragraph 23.A. to an initial twenty-day "grace period" and to an additional ten-day warning notice from the carrier before cancellation. The purpose of the letter was not, as Jones' beneficiaries suggest, to notify him that the carrier could thereafter only cancel the policy without "further directive from the Pool Manager."

Third, the Assigned Risk Pool had always interpreted article 5.76 and the rules, regulations and procedures adopted under the statute as authorizing a carrier to cancel a policy without any prior directive from the Assigned Risk Pool. This interpretation, which was consistent with the language of the cancellation clause in the policy, is entitled to great weight because it did not conflict with the wording of article 5.76. *See Citizens Nat. Bank of Paris, Ill.,* 527 S.W.2d at 180.

After applying generally-accepted rules of interpretation, this court holds that article 5.76 did not expressly or impliedly prohibit Houston General from canceling the policy or restrict the right of cancellation to the Assigned Risk Pool; that the Assigned Risk Pool's rules, regulations and procedures did not contain such an express or implied prohibition or restriction; and that the cancellation provision in Hutchins' policy, which had been prescribed by the Board of Insurance Commissioners, did not con-

flict with article 5.76 or with the rules, regulations and procedures adopted by the Assigned Risk Pool. Therefore, points one through three are overruled, and the judgment is affirmed.