**RAILROAD COMMISSION OF TEXAS**
**et al., Appellants,**

v.

**DELHI–TAYLOR OIL CORPORATION**
**et al., Appellees.**

No. 10477.

Court of Civil Appeals of Texas.

Austin.

May 1, 1957.

Rehearing Denied May 22, 1957.

Will Wilson, Atty. Gen., James N. Ludlum, First Asst. Atty. Gen., for Railroad Commission of Texas.

Black & Stayton, Austin, for A. W. Taylor, trustee.

Small, Small & Craig, Austin, for appellees.

HUGHES, Justice.

The validity of a permit issued by the Railroad Commission of Texas to directionally drill a well for oil and gas to be bottomed under an .8 acre fee tract of land located in the McAllen Gas Field in Hidalgo County is the subject matter of this suit. The land is owned by appellant, A. W. Taylor, Trustee. The drilling permit was attacked in the court below by appellees Delhi-Taylor Oil Corporation and Mayfair Minerals, Inc., on the grounds (1) that the well was unnecessary to prevent physical waste and (2) the tract was created by a subdivision in violation of the spacing rule (37) of the Commission and hence not protected by the rule against confiscation.

Since we are of the opinion that the Taylor tract was not created by an illegal subdivision we need not discuss the evidence relating to physical waste.

Trial below was to the Court. There are no findings of fact or conclusions of law.

In the recent case of Brown v. Hitchcock, 235 S.W.2d 478, 480, writ refused, Associate Justice Gray for this Court thoroughly examined the authorities upon the question presented here and stated the law to be:

"The very purpose and object of the rules of the Railroad Commission under consideration here is the conservation of oil and gas, which includes regulation of the right of its capture. Until an area is brought under the jurisdiction of the Commission because of oil or gas activity in the area, there is no occasion to apply its rules, and until such time the Commission is not concerned with fee subdivision of land made without consideration for, or in anticipation of, oil or gas development. The rule (37a) itself provides for exceptions when necessary to prevent waste or confiscation of property. Indeed, if such exceptions were not recognized and permits to drill granted on tracts of smaller dimensions than set out in the rule proper, then confiscation of property would inevitably result to owners of small tracts because of drainage.

"The question here presented has been involved in prior decisions of this court. In Shell Petroleum Corp. v. Railroad Commission, Tex.Civ.App., 116 S.W.2d 439, 441, Er.Dis., this court sustained a permit to drill on a .53 acre tract of land when the evidence showed that, at the time of the partition of the land, the territory surrounding the .53 acre tract was 'not known nor anticipated to be productive of oil or gas.' There this court said: 'Neither rule 37 of the so-called state-wide application as promulgated by the Railroad Commission in 1919, nor any amendment thereto, nor any special rule 37 has any application to territory not known nor anticipated to be productive of oil or gas; and the rule inhibiting voluntary subdivision of lands which could have been developed as a whole in order to circumvent the provisions of rule 37 has no application to subdivisions of lands prior to the discovery of oil and gas in the territory where the lands are located.'"

The .8 acre Taylor tract was segregated July 16, 1946, from a 10 acre tract. On that date it was purchased by predecessors in title of the present owner for the purpose of building a drive-in restaurant on it, the property being located on U. S. Highway 83, a main highway through the City of McAllen. The price paid was $12,250. The restaurant was built and put in operation at a cost of about $8,000. Oil and gas development of the property did not enter into these negotiations.

On July 16, 1946, the 10 acre tract from which the .8 tract was segregated was not under an oil and gas lease. On such date only three of the now more than 30 gas wells in the McAllen field had been completed: The E. M. Card No. I well completed January, 1939, located approximately 9,500 feet west of the .8 acre tract; the Arizona-Texas Well No. I, completed August, 1941, located approximately 7,000 feet southwest of the .8 acre tract; and the Harrison-Jackson No. I, completed December, 1941, located approximately 12,000 feet northwest of the .8 acre tract. Another well was then drilling 8,000 feet west of the .8 acre tract and was later completed as a producer.

There was at that time no production north, east or south of the .8 acre tract.

In addition to the above there is other evidence of mineral development activity in the McAllen vicinity prior to July 16, 1946, which we will now describe.

The McCollum Exploration Company as an interpretation of extensive seismic work done by Dr. Burton McCollum in 1937–8 prepared a map showing what was believed to be structure capable of producing oil or gas or both. The "general area" covered by such map was irregular in size but approximately 27,000 feet in length and 15,000 feet wide at the center and such area extended into the towns of McAllen and Pharr and included thickly settled small tracts.

The .8 acre Taylor tract is in Lot 178 which is on the eastern perimeter of this "general area" as delineated on such map.

Dr. McCollum desired to develop the entire structure as a unit and in furtherance of this objective gave the plan considerable publicity including "town hall" meetings, Chamber of Commerce meetings, public discussions by attorneys, distribution of a form unitized lease and newspaper advertising.

Judge Charles E. Thompson, a witness for appellees in regard to the lease campaign conducted by Dr. McCollum, testified:

"Well, he (Dr. McCollum) stated that he expected to drill a test well, select one of the best locations he could for the test well, and if it were productive, then, that it would progress, the development would progress rapidly, and, as I said, at that state, everybody seemed to be thinking in terms of oil, and Dr. McCollum, as well as the rest, and he assured them that he had a structure there, and he stated frankly that he didn't know whether it would be productive or not, but he hoped that it would, and he also pointed out that it might be productive of gas instead of oil, because he had been developing down in Mercedes prior to that time and found very high pressure gas."

As a result of this activity many oil and gas leases were made in the "general area." Most of these leases were for five years and expired in 1943, the war having curtailed development. In 1943, a new lease campaign was commenced and Phillips Petroleum Company and others joined in.

In this campaign many leases in the "general area" were procured including leases on three tracts immediately west of the tract out of which the .8 acre tract was formed, leases on Block 184, which corners with such parent tract, leases on almost all of Block 177 which joins Block 178 on the east and leases in Blocks 176 and 175 to the north of the .8 acre tract.

Developments subsequent to July 16, 1946, when the Taylor .8 acre tract was formed, are that about 30 gas wells are now within the "general area" and that production comes from 14 separate horizons. That on July 31, 1946, when four wells had been completed the Railroad Commission heard an application for field rules and found that

"'three reservoirs are known to exist and produce in this field and that other reservoirs are probably capable of producing', (2) that 'this is primarily a gas field with the gas market being very steady', (3) that one of the sands 'varies in thickness from 65 to 100 feet', and (4) that 'the special rules and regulations hereinafter set out are necessary to prevent waste and provide for the orderly development of the field.'"

A well drilled after 1946 located 4,250 feet northeast of the .8 acre tract was a dry hole and it is closer to such tract than any of the three wells producing on July 16, 1946.

■ According to Hitchcock, supra, the jurisdiction of the Commission in oil and gas matters does not attach to land unless there is "oil or gas activity in the area" or if a "territory [is] not known nor anticipated to be productive of oil or gas."

Certainly it was not "known" that this .8 acre tract in July, 1946, was in an oil or gas producing area. The nearest well then was about 1.3 miles away and the limits of the field were undefined there having been no wells drilled north, south or east of the tract.

Was the .8 acre tract "anticipated to be productive of oil or gas?" If "anticipation" means "hope" then certainly it was. We believe "anticipation" here means "expectation," reasonable expectation. The basis of "anticipation" here was the existence of the three gas wells, the McCollum seismograph and oil leasing activity in the area.

■ The Commission, expert in these matters, has appraised these facts, weighed them carefully, and has concluded that its jurisdiction did not attach to this tract in 1946. We cannot hold this conclusion arbitrary or not reasonably supported by substantial evidence.

We have noted the inconclusive character of the actual drilling. The seismograph depicting a structure is, of itself, of little, if any, significance to us. Our knowledge of its connotations is finite. What it meant to the general public in the McAllen-Pharr area the record does not show. Dr. McCollum upon whose seismic work the graph was based "hoped" that the structure would be productive.

Even should we concede that such seismograph is strong evidence of a productive area its effect here is minimized by the fact that the .8 acre tract is on the very edge of the structure. An error of a few hundred feet would mean the difference between a producer and a dry hole. The evidence suggests no such precision in seismic operations.

Turning now to the lease transactions. Are these "oil and gas activities" sufficient to bring the entire area within the jurisdiction of the Committee? The record shows that $10 per acre was the prevailing price for leases. Since the area was thickly settled and divided into lots and small tracts the cash paid to lessors would hardly be enough to cover the cost of including the lease in the abstract of title. Certainly the bonus paid was unsubstantial, the real consideration being the obligation to drill. These factors are indicative of "wild cat" operations and do not, in our opinion, establish commercial oil and gas transactions in proven territory or in an area where the production of oil or gas may be reasonably expected. They are not such transactions as do or should have the effect of putting a blight upon the right of a nonparticipating landowner to divide and dispose of his property in a legitimate and prudent business

manner undisturbed by the dreams of his neighbors.

We sustain the validity of the permit; the judgment of the trial court setting such permit aside is reversed and judgment is here rendered that appellees take nothing by their suit.

.Reversed and rendered.