MICHEL T. HALBOUTY ET AL, Appellants

v.

RAILROAD COMMISSION OF TEXAS ET AL, Appellees

No. A-8200. Decided February 14, 1962
Rehearing Denied May 23, 1962
357 S.W. 2d 364

418

ASSOCIATE JUSTICE GRIFFIN dissenting, and ASSO-
CIATE JUSTICE SMITH dissenting on Motion for Rehearing.

*Andrews, Kurth, Campbell & Jones,* Houston, *(L. E. Frazier,
Jr.,* and *Harry R. Jones,* Houston) for Michel T. Halbouty and
Meredith & Company.

*Butler, Binion, Rice & Cook,* Houston *(A. E. Amerman, Jr.,
Cecil Cook,* and *James D. Smullen,* Houston) for Peter Henderson
Oil Company.

*Turner, Rodgers, Winn, Scurlock & Terry,* Dallas *(Frank J.
Scurlock,* Dallas), for Pan American Petroleum Corporation.

*Will Wilson,* Atty. Gen., Austin *(Houghton Brownlee, Jr.,* and *Linward Shivers,* Asst. Attys. Gen., Austin) for Railroad Commission of Texas.

*Blalock, Lohman & Blalock,* Houston, *Hart & Hart,* Austin, for Intervenors H. L. Dillon et al.

*Wallace H. Scott, Jr.,* Austin, for Intervenor J. C. Barnes.

*McKay & Avery,* Austin, for Intervenor Tyrell-Combest Realty Co.

*Spruiell, Lowry, Potter, Lasater & Guinn,* Tyler, for Intervenor P. G. Lake, Inc.

ASSOCIATE JUSTICE CULVER delivered the opinion of the Court.

Michel T. Halbouty and others bring this direct appeal from a decree of the trial court upholding certain orders of the Railroad Commission of Texas and denying to the appellants a permanent injunction and all other relief prayed for.

In the trial court the appellants sought to restrain the Railroad Commission from continuing in effect the allocation formula adopted August 18, 1958, for the Port Acres Field in its order No. 3-38,395 which reads as follows:

"RULE 3. The daily allowable production of gas from individual wells completed in a non-associated gas reservoir of the subject field shall be determined by allocating the allowable production, after deductions have been made for wells which are incapable of producing their gas allowables, among the individual wells in the following manner:

"a) Two-thirds (2/3) of the allowed gas production from a non-associated gas reservoir shall be allocated to the individual wells completed therein in that proportion that the acreage assigned to each such well bears to the sum of the acreage in the reservoir.

"(b) One-third (1/3) of the allowed gas production from a non-associated gas reservoir shall be allocated equally among the individual wells completed therein.

"(c) The total daily non-associated gas allowable for each well shall be the sum of its acreage and per well allowables."

They also prayed that the Commission be further enjoined from allowing the marketing of gas from the Port Acres Field until the Commission required the operators in the field to maintain the pressure at such point as would permit the maximum recovery of hydrocarbons contained in the reservoir and to prevent unnecessary waste of those natural resources.

The trial court sustained exceptions to the pleadings in so far as they were directed to the refusal of the Railroad Commission to enter the compulsory cycling and pressure maintenance order and found and concluded that the order of the Commission otherwise complained of was reasonably sustained by substantial evidence and is lawful and valid.

At the outset the Railroad Commission and the other appellees vigorously challenge our jurisdiction of this direct appeal on the ground that such appeal will lie only where the purpose of the suit is to restrain action or threatened action on the part of the Commission and not when the object of the suit is to compel action. In other words they say that the real purpose and object of this suit is to compel the Railroad Commission to enter a new proration order and to order cycling and pressure maintenance in the Port Acres Field.

To support their position in this respect they rely on our decision in Boston v. Garrison, 152 Texas 253, 256 S.W. 2d 67. That suit as first filed sought to restrain the officials of the Department of Public Safety from suspending a chauffeur's license. Prior to the trial the license had expired and plaintiff, by an amendment to his petition, sought to compel the department to renew the old or issue a new license. We held that direct appeal would not lie in that respect and that his only redress was in the nature of a mandamus. We did not hold that we would not have jurisdiction of the appeal from the refusal of the trial court to restrain the department from suspending the license but that matter had become moot.

■ In the case here the appellants assert that the proration formula of one-third and two-thirds is unjustified, unreasonable and invalid and of that issue we do have jurisdiction. Incidentally, a striking down of this proration order would, in the natural course of things, enjoin upon the Railroad Commission the duty to write a new order, but it is not within the scope of our juris-

diction here to direct the Commission in that regard. What we have before us is the validity vel non of the order as written. Railroad Commission v. Sterling Oil & Refining Co., 147 Texas 547, 218 S.W. 2d 415; Board of Water Engineers v. Colorado River Municipal Water District, 152 Texas 77, 254 S.W. 2d 369; Texas & N. O. Ry. Co. v. Railroad Commission, 155 Texas 323, 286 S.W. 2d 112; Railroad Commission v. Shell Oil Co., 146 Texas 286, 206 S.W. 2d 235.

Article 1738a, Vernon's Ann. Civ. Stat., reads in part as follows:

"* * * appeals may be taken direct to the Supreme Court of this State from any order of any trial court granting or denying an interlocutory or permanent injunction * * * on the ground of the validity or invalidity of any administrative order issued by any State Board or Commission under any statute of this State. * * *."

The article further provides that the Supreme Court shall prescribe the necessary procedural rules to be followed in perfecting such appeal. Pursuant to that directive, Rule 499-a was adopted.

In Atlantic Refining Co. v. Railroad Commission of Texas, 346 S.W. 2d 801, our jurisdiction of the direct appeal was attacked and while we did not there discuss the question of jurisdiction that decision by implication holds contrary to appellees' contention.

In so far as appellants complain of the refusal of the Railroad Commission to require compulsory cycling and pressure maintenance in this field is concerned, we do not have jurisdiction of the appeal. The jurisdiction of the Supreme Court on direct appeal is dependent upon and limited to the wording of the Constitutional Amendment, Art. 5, Section 3b, and Art. 1738a, Vernon's Ann. Civ. Stat. While in the trial court appellants prayed for an injunction to restrain the Commission "from approving or allowing the withdrawals of gas to market from the Port Acres Field in such quantity and under such conditions as will result in the preventable waste of the hydrocarbon content of such gas until such time as the Commission has duly entered an order or orders requiring the operators in such field to maintain the pressure in the field at a point which will permit the maximum recovery of the hydrocarbons contained in the reservoir to the end that preventable waste of such natural resources shall be pre-

vented," nevertheless the actual relief sought was to require the Commission to enter a compulsory cycling and pressure maintenance order. It was so considered and treated by the Commission.

These proceedings were instituted before the Commission in the following manner: On November 19th, three months after the adoption of Special Order No. 3-38,395, Peter Henderson Oil Company requested that the Commission hold a hearing to reconsider and amend Rule 3 thereof. Notice was given that the hearing was set for January 27, 1959. On January 22nd Halbouty and Meredith joined in the Henderson Company request and asked that the issues be broadened to include the question of whether recycling or other secondary recovery operations should be instituted and conducted. On January 23rd Pan American joined in the Halbouty-Meredith request. On July 6, 1959, after hearing and consideration, the Commission notified all parties of its action as follows:

> "This is to advise that the Commission, at a formal conference held July 6, 1959, denied your application for a mandatory cycling order for the Port Acres (Lower Hackberry) Field, Jefferson County, Texas.

> "The Commission further denied your application for an allocation formula based on net acre feet for the subject field and ruled that the allocation formula based on 2/3 acreage and 1/3 per well shall continue to remain in effect."

In Boston v. Garrison et al., supra, under the direct appeal provision it was pointed out that the Supreme Court does not have jurisdiction where the purpose of the suit is to require or to compel action although the relator prayed "that mandatory injunction shall issue requiring the defendants to issue plaintiff renewal license or provisional license". That in effect was an application for mandamus to compel the department to issue the license.

In Lane v. Ross, 151 Texas 268, 249 S.W. 2d 591, the relators prayed that the respondent be ordered and commanded not to transmit to the chairman of a state political committee certain minutes and returns of election and that the respondent be ordered to transmit certain other minutes and returns. We held that in this original action this court did have jurisdiction to issue a writ of mandamus but no jurisdiction to grant injunctive relief and since there appeared to be no need for issuance of the mandamus the petition was dismissed.

In Boston v. Garrison we said:

"* * * In that case [Lane v. Ross] there was jurisdiction to issue the writ of mandamus but no jurisdiction to issue a writ of injunction, and because of the want of jurisdiction the injunctive relief was denied. Here, assuming that constitutionality or validity is properly involved, the court has jurisdiction on direct appeal from an order or judgment granting or denying an injunction, but no jurisdiction on direct appeal from an order or judgment granting or denying mandamus."

■ So here an application to restrain the Commission from allowing gas to be marketed until the Commission has entered an order requiring recycling of gas is the equivalent of an application to have the court compel the Commission to enter the recycling order. The appeal to the district court lay from two separate and distinct and severable orders of the Commission. A combination of the two complaints in one cause would not serve to give us jurisdiction where otherwise it would not attach.

It appears that the Port Acres Field produces only gas and condensate. It embraces an area of approximately 3,000 acres. The discovery well was completed in 1957. The production is from sands at a depth of something over 10,000 feet. The Commission, in its special order for this field, adopted the following spacing rule:

"Rule 1. No gas well shall hereafter be drilled nearer than thirteen hundred and twenty (1320) feet to any well completed in or drilling to the same reservoir on the same lease, unitized tract or farm, and no well shall be drilled nearer than three hundred and thirty (330) feet to any property line, lease line or subdivision line; provided, however, that the Commission will, in order to prevent waste or to prevent the confiscation of property grant exceptions to permit drilling within shorter distances than herein prescribed whenever the Commission shall have determined that such exceptions are necessary either to prevent waste or to prevent the confiscation of property. When exception to this rule is desired, application therefor shall be filed and will be acted upon in accordance with the provisions of Commission State-wide Rules 37 and 38, which applicable provisions of said rules are incorporated herein by reference.

"The aforementioned distances in the above rule are minimum distances to allow an operator flexibility in locating

a well, and the above spacing rule and the other rules to follow are for the purpose of permitting only one well to each one hundred and sixty (160) acre proration unit."

Thus the Commission determined that one well to 160 acres would effectively recover all of the hydrocarbons contained in the field reservoir.

At the time of the trial there were said to be 25 producing wells on large units or tracts and 22 producing wells drilled under permits issued as exceptions to Rule 37.

This suit was brought by Pan American Petroleum Corporation, Michel Halbouty and Meredith and Company. Peter Henderson Oil Company intervened and these four are appellants. A number of the small tract owners intervened and aligned themselves with the Commission. They are H. L. Dillon, Jr., H. C. Barnes, Tyrell-Combest Realty Company and P. G. Lake, Inc. Most of the small tract owners in this field have entered into unitization agreements. For instance, the Peter Henderson Oil Company units, three in number, consist of several hundred small tracts. The 22 Rule 37 wells are situated on tracts ranging from 2/10ths of an acre up to 5 acres; 16 embraced less than one acre and 10 less than one-half acre.

■ The principal contention urged by the appellants is to the effect that the proration formula in this field allocating production on a basis of one-third per well and two-thirds on the amount of acreage in the tract is not reasonably sustained by substantial evidence, but on the other hand is arbitrary, unreasonable and confiscatory of appellants' property. Under the record before us we are of the opinion that this case is controlled by our recent decision in Atlantic Refining Co. v. Railroad Commission, 162 Texas 274, 346 S.W. 2d 801 (hereinafter referred to as Normanna) and the point is therefore sustained.

The Attorney General in his brief for the Railroad Commission squarely points up the real issue before us that goes to the heart of this case. He says "that townsite operators do have a property right in the reserves underlying the large tract owners, and that that right extends to the right to drain enough oil or gas from other tracts in the field to yield a reasonable opportunity for a profit to the operator." The other appellees also assert that right.

In other words, since the owner of a tract, no matter how

small, is entitled to one well to prevent the confiscation of the gas underlying his tract, he, therefore, becomes entitled to confiscate gas from adjacent properties sufficient to pay the cost of his drilling operations and return a reasonable profit. In support of that proposition he cites only Railroad Commission v. Humble Oil & Refining Co., Tex. Civ. App., 193 S.W. 2d 824, wr. ref. n.r.e., [the Hawkins case] where the following statement is to be found:

> "As a corollary to these rules, it is held that the owner of an 'involuntary' segregated tract cannot be denied the right to drill at least one well on his tract however small it may be. From which it would seem that his allowable can not be cut down to the point where his well would no longer produce, (See Railroad Commission v. Mackhank, Tex. Sup., 190 S.W. 2d 802) nor below the point where it could not be drilled and operated at a reasonable profit." (No authority is cited in support of the latter conclusion).

In the Mackhank case the only proposition decided by this court was that there was substantial evidence reasonably supporting the conclusion that in order to prevent waste it was necessary to keep the two wells on production and the order was therefore not invalid. The Mackhank decision can in no way be construed as authority for a rule that would require allowable production sufficient to return the cost of the well and its operation plus a reasonable profit. The conservation statutes nowhere suggest such a factor. We find nothing in the law to justify that proposition.

In the Hawkins case the testimony was that Humble's properties contained 76.5 per cent of the recoverable reserves of the entire field and under the effective proration order it was allowed to produce only 71.4 per cent and this, if continued for the estimated life of the field, some 27 years, would result in drainage from the Humble's properties to the Townsite section of some thirty million barrels of Humble's oil. Some witnesses, on the other hand, testified that the productive life of the Townsite 73.74 acres would be shortened below that of the remainder of the field by some ten years on account of its position on the structure and the heavy withdrawals. Another witness testified that in his opinion if production were unrestricted the town lot wells would produce more oil than under the proration order then in effect. The court pointed out other considerations and factors which served to support the reasonableness of the Commission's order.

The Hawkins case goes further to state the accepted rule which is contradictory of any theory that the allowable must be fixed on a cost plus profit basis, namely, "In the exercise of this rule of curtailment it is generally recognized that the rules and regulations adopted must, as far as practical, and within reasonable limitations afford the several property owners a fair opportunity to produce the recoverable oil underlying their lands or its equivalent." This rule had theretofore been firmly established in our jurisdiction.

In Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W. 2d 73 (1939), we held:

"* * * It is the law that every owner or lessee of land is entitled to a fair chance to recover the oil and gas in or under his land, or their equivalents in kind. Any denial of such fair chance would be 'confiscation' within the meaning of Rule 37 and the Rule of May 29th. Empire Gas & Fuel Co. v. Railroad Commission, Tex. Civ. App., 94 S.W. 2d 1240, writ refused. * * * "

Again in Trapp v. Atlantic Refining Co., Tex. Civ. App., 169 S.W. 2d 797, wr. ref., it is said:

"* * * The uniform holding has been that the criterion implicit in this exception is whether the well is necessary to protect the owner in his right to obtain his fair share (or the equivalent thereof) of the recoverable oil underlying his land. Both of these exceptions were discussed and upheld in Gulf Land Co. v. Atlantic Refining Co., 134 Texas 59, 131 S.W. 2d 73. Since the issue raised in this contention has been so conclusively adjudicated, its discussion as an original proposition is both unnecessary and undesirable."

The Legislature announced a declaration of policy in the production and use of natural gas in Section 1, Art. 6008 as follows:

"In recognition of past, present, and imminent evils occurring in the production and use of natural gas, as a result of waste in the production and use thereof in the absence of correlative opportunities of owners of gas in a common reservoir to produce and use the same, this law is enacted for the protection of public and private interests against such evils by prohibiting waste and compelling ratable production."

In Corzelius v. Harrell, 143 Tex. 509, 186 S.W. 2d 961, we quoted with approval the language used by the United States Supreme Court in Thompson v. Consolidated Gas Corporation, 300 U.S. 55, 57 Sup. Ct. 364, 81 L. Ed. 510:

■ "* * * It may be assumed that House Bill 266 [Art. 6008] should be construed as authorizing regulations to prevent waste, and to create and protect correlative rights of owners in a common reservoir of gas to their justly proportionate shares thereof, free of drainage to neighboring lands. * * * "

In Marrs v. Railroad Commission, 142 Tex. 293, 177 S.W. 2d 941, we held that "Under the settled law of this State oil and gas form a part and parcel of the land wherein they tarry and belong to the owner of such land or his assigns; and such owner has the right to mine such minerals subject to the conservation laws of this State. Every owner or lessee is entitled to a fair chance to recover the oil or gas in or under his land, or their equivalent in kind, and any denial of such fair chance amounts to confiscation."

As pointed out in Normanna we also held in the Marrs case that the allowables fixed for the two separate areas were entirely out of proportion to the potentials and would result in the taking of one man's property and giving it to another. Although the Marrs case rejected the substantial evidence rule, nevertheless that is not to say that the rules of law otherwise announced by that decision are wrong or have been overruled by later decisions of this court.

In the case presently before us the basic facts are not substantially in dispute. The contentions arise over conclusions to be drawn from those facts. From the testimony of Dillon's witness, the only witness offered by any of the appellees, it appears that a 1-acre tract under the 1/3-2/3 formula would have a total gross income from April 1, 1960, to the end of its productive period of $407,501.00. The total cost of such a well, including drilling, operating, and royalty expenses, would be $361,674.00, leaving a net profit of $45,827.00. The same testimony shows that under a formula based on acre feet of producing sand, each 1-acre tract even without prior production would have only a total gross income of $50,867.00. This witness further testified that the total hydrocarbon recovery from each 1-acre tract under the 1/3-2/3 formula would be 1,542,987 MCF of gas and 69,358 barrels of condensate. That of this total recovery, 1,432,987 MCF of gas and 62,858 barrels of condensate would be contributed by

drainage. In other words, each 1-acre lot depends upon drainage for 92.87% of its gas recovery and 90.63% of its condensate recovery.

The witness further testified that the estimated field capability is 165,932,900 MCF of gas and 7,458,732 barrels of condensate; that the 22 small tract wells combined would recover 33,945,714 MCF of gas and 1,525,876 barrels of condensate. This witness estimates a total of 116,063 acre feet of producing sand in the Port Acres Field and he assigns 2,050 acre feet of this total or 1.77% to the 22 Rule 37 tracts. According to his figures, these small tracts with 1.77% of the producing sand would under the 1/3-2/3 formula recover 20.46% of the field's total gas and condensate potential.

Petitioner's exhibit from the Railroad Commission allowable schedule for September, 1960, shows 20 Rules 37 wells with a total allowable of 193,599 MCF of gas. Twenty-five wells on normal 160-acre proration units (some being less than 160 acres) are allowed to produce 1,116,416 MCF of gas. The tracts on which the 20 Rule 37 wells are situated comprise only 19.89 acres, while the 25 regular wells are located on 3,036 acres. Thus, on a productive acre basis, the 20 wells having .65% of the total acreage receive 14.6% of the allowable.

By way of comparison between the well on one of the largest producing units and the well on one of the smallest units, the following table is constructed from the testimony of the appellees' witness:

| SURFACE ACREAGE | | MONTHLY ALLOWABLE (MCF) | AVERAGE |
|---|---|---|---|
| Pan American-Ward | 1—176.00 | 48,587 | 276.06 MCF per acre |
| Thompson-Sassine | .25 | 48,587 | 38,060.00 MCF per acre |
| ACRE FEET OF SAND | | | |
| Pan American-Ward | 1—9,851.9 | 9,515 | 4,932 MCF per acre ft. |
| Thompson-Sassine | 17.8 | 9,515 | 534.551 MCF per acre ft. |

Thus, on the basis of the present proration order the well on the one-fourth acre tract is allowed to produce 137 times as much gas per acre as the well on 176 acres and 107 times more per acre foot of producing sand.

Article 6008, Section 12, Vernon's Ann. Civ. Stat., provides that the Commission shall proceed to regulate and prorate gas production in the reservoir "on a reasonable basis". The Article

further provides that "the monthly reservoir allowable shall be allocated among all wells entitled to produce gas therefrom so as to give each well its fair share of the gas to be produced from the reservoir, provided that each well shall be restricted to the amount of gas that can be produced from it without waste." Section 12 of that statute provides that the Commission shall take into account in fixing the daily allowable production for each gas well the size of the tract, the relation between the daily producing capacity and the aggregate daily capacity of all gas wells and all other factors which are pertinent.

The appellees offered some testimony that there is potentially a water drive from the east to the west that would result in longer and greater production in the western portion of the field where the Rule 37 wells are located, the theory being that this water drive would limit and flood out the eastern wells forcing the gas westward into the higher structure where the Henderson Rule 37 wells are located, thus compensating Henderson at least in part for the drainage loss. On the other hand the appellants' witnesses emphatically assert that there is presently no water drive and deny that there is any indication of such occurrence in the future. We understand from the testimony that no water drive has yet occurred that has resulted in any loss to or flooding of the wells to the east where the drive would first be felt. Admittedly these Rule 37 wells are located in the area where the producing sand stratum is thicker and the structure is higher. In our opinion neither of these factors offer any comfort to the Rule 37 appellees because their tracts are almost completely surrounded by and lie within the confines of the Peter Henderson oil units and will necessarily drain from those units. There is testimony in the record that Halbouty and Meredith under the 1/3-2/3 formula will eventually produce substantially all of the gas estimated to underlie their land, but this fact does not tend to make the formula a reasonable one as between the Rule 37 wells and Henderson.

In making a comparison between the Peter Henderson units and the 20 Rule 37 wells[1] we use the testimony of appellees' witness. The Henderson units comprise 520.3 acres or 19.84% of the total field acreage and have 16.13% of the total field allowable while the 20 Rule 37 wells have a total of 19.88 acres or .76% of the total acreage and receive 14.78% of the total allowable.

From the testimony of the same witness it appears that Peter

---

1. Only wells on October, 1960, Proration Schedule are used.

Henderson has 33,807 acre feet or 29.37% of the total acre feet in the field, while the 20 Rule 37 wells have only 1,957 or 1.70% of the total.

The appellees urge that this case is distinguishable from Normanna on the facts and therefore the latter should not control. (1) They say the Normanna Field had not been substantially developed, whereas the Port Acres Field is well developed. While this is true, that fact would appear to militate in favor of the appellants rather than of the appellees because the greater the development and the more accurate the obtainable geological information, the less justification can be found for applying the standard 1/3-2/3 proration formula. (2) They maintain that the allocation formula here is beneficial to some of the large tract producers and does not deprive them of any property rights. Although there is evidence that some of these producers, due to early production, or for other reasons, may recover 100% or more of their reserves in place, it is clear, however, that at least one of them, Henderson Oil Company, whose large units are composed of unitized small tracts, will suffer loss from drainage to the Rule 37 wells. (3) They say as contrasted with Normanna this is not solely a case of large tracts against small ones because Henderson makes the contention that the formula is inequitable as among the large tracts. We fail to see how this would make a material distinction, although the case here is principally one of small tracts that have been unitized against small tracts whose owners have preferred not to unitize. In Normanna we were concerned with only one small tract. Here 40 permits have been granted to drill small tracts of which there are 500 in the field, presenting a much more serious problem so far as orderly economical development is concerned.

Another point of distinction urged is that in Normanna the attack was made against the 1/3-2/3 formula while in this case the appellants asked the Commission to enter their "recommended order" in lieu of the 1/3-2/3 proration order. In other words they say that by the terms of appellants' application the Commission was limited to an acceptance or rejection of the recommended order in that the appellants asked for no other relief than on a "take it or leave it" basis. They argue that there is a great difference procedurally between an application to enter a specific order and one claiming that the rule in effect is unduly harmful and requesting the Commission to rescind that rule and enter one that is fair and in its stead.

We do not so construe the proceedings in this case nor evi-

dently did the Commission. Henderson's application reads: "On behalf of Peter Henderson Oil Company we wish to request a hearing to reconsider and amend Rule 3 of the special order adopting rules and regulations for the Port Acres [Lower Hackberry] Field of Jefferson County, Texas." At the time of filing of Henderson's application, November 19, 1958, only one permit to drill in this field as an exception to Rule 37 had been requested and it was not granted until December 22, 1958. The notice of the hearing issued by the Commission recited that the hearing would be held for the purpose of considering the application of Peter Henderson Oil Company and concluded as follows: "Pursuant to said Hearing the Commission will enter such rules, regulations, and orders as in its judgment the evidence presented may justify."

In Henderson's motion to the Commission for rehearing it is argued that the present formula is unjust and unfair and does not allow to all parties a fair opportunity to have and produce their fair share of the gas and condensate from the reservoir. In that connection the motion urges the Commission to take into consideration the variation of the sand thickness, the size of the tracts, the drainage from the thick sand portion of the field into the thin sand and all other pertinent factors shown by the evidence to exist. It is also argued that if the per well factor is retained it should be substantially less than one-third.

The proceedings before the Railroad Commission are informal and their validity will not be tested by the technical rules of pleadings and practice that obtain in court trials. Railroad Commission v. Magnolia Petroleum Co., 130 Tex. 484, 109 S.W. 2d 967; Cook Drilling Co. v. Gulf Oil Corporation, 139 Tex. 80, 161 S.W. 2d 1035.

The fact that appellants suggested and urged upon the Commission that the proration formula should limit recovery substantially to the reserves in place beneath each tract does not foreclose their right to complain of the formula which they considered inequitable and confiscatory of their property nor does it limit the Commission solely to the option of either accepting or rejecting the proposed formula in toto. All parties, of course, concede that the court is not empowered to direct the Commission as to the nature or terms of its order or what weight should be given to the several allowed factors. We are limited to passing upon the validity of the order as promulgated.

The appellees, in seeking to uphold the proration formula adopted by the Commission, discuss at considerable length the so-

called "rule of capture" and claim some benefit or protection under that rule. They cite among other cases Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W. 2d 935, 87 S.W. 2d 1069; Corzelius v. Harrell, 143 Tex. 509, 186 S.W. 2d 961; Ryan Consolidated Petroleum Corporation v. Pickens, 155 Tex. 221, 285 S.W. 2d 201. The doctrine of these cases is stated in Corzelius as follows:

> "The rule in this State recognizes the ownership of oil and gas in place, and gives to the lessee a determinable fee therein. It is also held that such rule should be considered in connection with the law of capture, which is recognized as a property right and both rules are subject to regulation under the police power of this State."

Somewhat more positively we said in Eliff v. Texon Drilling Company (1948), 146 Tex. 575, 210 S.W. 2d 558, 4 A.L.R. 2d 191,[2] that:

> "In our state the landowner is regarded as having absolute title in severalty to the oil and gas in place beneath his land. The only qualification of that rule of ownership is that it must be considered in connection with the law of capture and is subject to police regulations."

In Ryan v. Pickens it is stated that "The courts of Texas have consistently held that the rule of capture is still in force in this State. It has become a vested property right." That is not to say, however, that the rule of capture is unlimited or not modified by the accompanying rule recognized by all the cases and stated in the Ryan case as follows:

> "* * * Here [in Texas] oil and gas in place are by the established rules of property a part of the realty or corpus of the land, and subject to ownership, severance, conveyance, lease and taxation as such. * * *."

The very fact that the Commission has the right to limit production on the basis of acreage is a recognition of that principle. If the Commission has the legal right, which they formerly exercised, to fix a proration formula based one-half per well and

---

2. See also cases cited:

Lemar v. Garner, 121 Texas 502, 50 S.W. 2d 769; Humphreys-Mexia Co. v. Gammon, 113 Texas 247, 254 S.W. 296, 29 A.L.R. 607; Waggoner Estate v. Sigler Oil Co., 118 Texas 509, 19 S.W. 2d 27; Texas Co. v. Daugherty, 107 Texas 226, 176 S.W. 717, L.R.A. 1917F, 989.

one-half on the amount of acreage, and as now generally practiced of basing the allowable 1/3 on the well and 2/3 on the acreage, then there is nothing in the rule of capture that would make it illegal for the Commission in the exercise of its sound judgment and discretion now to give greater or less weight to the well or acreage factors or for that matter to the amount of reserves in place or any other field factors as provided by the statute.

It is an obvious result that if in a common reservoir one tract owner is allowed to produce many times more gas than underlies his tract he is denying to some other landowner in the reservoir a fair chance to produce the gas underlying his land.

As to the right of capture, appellees refer to the following statement in Brown v. Humble Oil & Refining Co., 126 Tex. 297, 83 S.W. 2d 935, 87 S.W. 1096:

> "Owing to the peculiar characteristics of oil and gas, the foregoing rule of ownership of oil and gas in place should be considered in connection with the law of capture. This rule gives the right to produce all of the oil and gas that will flow out of the well on one's land; and this is a property right. And it is limited only by the physical possiblity of the adjoining landowner diminishing the oil and gas under one's land by the exercise of the same right of capture. The following decisions discuss the law of capture as applied in this State: Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; H. & T. C. Ry. Co. v. East, 98 Tex. 146, 81 S.W. 279, 66 L.R.A. 738, 107 Am. St. Rep. 620, 4 Ann. Cas. 827; Prairie Oil & Gas Co. v. State (Tex. Com. App.) 231 S.W. 1088, 1089. Both rules are subject to regulation under the police power of a state."

The court seems here to be merely stating what the rule of capture is if unlimited by correlative rights, for in the preceding paragraph the court expressly reaffirms that in Texas the law recognizes the ownership of oil and gas in place and gives to the lessee a determinable fee therein.

To infer that the rule of capture gives to the landowner the legally protected right to capture the oil and gas underlying his neighbor's tract is entirely inconsistent with the ownership theory. To harmonize both rules, the rule of capture can mean little more than that due to their fugitive nature, the hydrocarbons when captured belong to the owner of the well to which they flowed, irrespective of where they may have been in place originally,

without liability to his neighbor for drainage. That is to say that since the gas in a continuous reservoir will flow to a point of low pressure the landowner is not restricted to the particular gas that may underlie his property originally but is the owner of all that which he may legally recover. This seems to be substantially the view expressed in Brown v. Humble, supra.

In Stephens v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566, it was determined that the rule of capture does not conflict with the view of absolute ownership of the minerals in place and we quote: "If the owners of adjacent lands have the right to appropriate, without liability, the gas and oil underlying their neighbor's land, then their neighbor has the correlative rights to appropriate, through like methods of drainage, the gas and oil underlying the tracts adjacent to his own." In the Port Acres Field under the application of the existing proration formula Henderson does not enjoy any correlative rights so far as the small tract wells are concerned since there can be no compensatory drainage to Henderson from the small tracts.

In Normanna the evidence shows that the 1/3-2/3 formula would result in the drainage of a tremendous quantity of gas and condensate from other leases in the field to the .3-acre lease in question, though the precise amount of drainage was incapable of ascertainment, and of course such drainage could not be compensated by drainage from the .3-acre tract to other leases in the field. The evidence further showed that the order would allow the well on the .3-acre tract to produce at a rate of over 200 times as much gas per acre as a well on the 320-acre unit established by the spacing pattern. We think the evidence here is comparable to that in Normanna. Under the order adopted in the Port Acres Field more than 90% of the hydrocarbons recovered by the Rule 37 wells would be drained from other leases in the field. As said in Normanna the proration formula adopted here of 1/3-2/3 does not come close to compelling ratable production nor afford to each producer in the field an opportunity to produce his fair share of gas from the reservoir.

We fully appreciate the thorny problem that the Commission has in this matter of proration among the hundreds of fields under their supervision with different characteristics and the diverse conflicting interests, views and opinions, but we are confident that with the trained personnel at their disposal a much nearer approximation can be made, giving to all parties an opportunity to produce a fair share of the minerals underlying the field with ratable allowables that will be more nearly equitable than appears

in the case before us. As long ago as 1935 we said in the Brown v. Humble Oil & Refining Company case:

"* * * It is now, however, recognized that when an oil field has been fairly tested and developed, experts can determine approximately the amount of oil and gas in place in a common pool, and can also equitably determine the amount of oil and gas recoverable by the owner of each tract of land under certain operating conditions."

So far as the appellees' complaint that a striking down of the 1/3-2/3 formula would probably entail heavy financial loss to them, it may be said that they drilled their wells at their own risk. There is some indication in the record by bill of exception that they were offered unitization that would prevent confiscation and afford to them a fair share of the mineral proceeds from the common source. While the statute does not compel unitization, nevertheless it does expressly authorize that procedure subject to the approval of the Railroad Commission, Art. 6008b, V.A.C.S. It is to be reemphasized that their permits were granted for the purpose of avoiding confiscation of the minerals underlying their properties and not for the purpose of enabling them to drain the minerals underlying adjoining lands to pay the cost of their operations plus profits. This does not mean and we are not to be understood as foreclosing the power of the Commission, by proper order or exception, to allow the holder of a Rule 37 permit to recover a sufficient amount of oil or gas to repay drilling and production costs and provide a reasonable profit when no other means of recovering the minerals which underlie his land are available. No such problem is before us.

From the foregoing it follows that the 1/3-2/3 proration formula as applied by the Commission in the Port Acres Field is invalid in that it does not afford an opportunity to all of the parties to produce and save their fair share of the minerals or their equivalent. We hold that it is not reasonably supported by substantial evidence.

The judgment of the trial court is reversed and judgment rendered for appellants.

Opinion delivered February 14, 1962.

SMITH, JUSTICE, dissenting on Motion for Rehearing.

I respectfully dissent. Upon further consideration, I find that

to agree with the majority would place me in a completely inconsistent position with that of former decisions of this Court, especially those wherein I was the author of the majority opinions. This is especially true when considered in the light of the decisions in Ryan Consolidated Petroleum Corporation v. Pickens, 155 Tex. 221, 285 S.W. 2d 201, and other cases discussed herein. Not only that, the majority opinion bears out my fear that the Normanna decision was the opening wedge to compulsory pooling by judicial decree. See my dissent in Atlantic Refining Company v. Railroad Commission, 162 Tex. 274, 346 S.W. 2d 801. However, expressions in the majority opinion in that case lead me to think that possibly the holding announced by the majority only applied to that particular case. I am inclined to believe that many of the oil and gas attorneys were of a similar view. When I wrote the dissent in Normanna, it was my deliberate purpose to guard against compulsory pooling by judicial decree. I find the Court now following the advocates of compulsory pooling in the present case, although the Normanna case did not actually deny the right of separate development to owners of small tracts. I am now convinced that the Halbouty decision effectually denies such right and apparently authorizes compulsory pooling without any legislative authorization.

The right of separate development of small tracts has long been recognized by the Texas courts. In fact, it has become a settled rule of property. The fact that the rule was announced in so-called Rule 37 cases does not mean that such rule is confined in application to such cases.

The Railroad Commission of Texas has in the past rigidly followed the law as announced by this Court in Ryan and other cases and has adopted rules consistent with the principles of law announced in cases prior to Normanna. The Railroad Commission steadfastly adhered to the law and has awaited action of the Legislature, the only department of government that has the legal power to compel compulsory pooling.

After the Normanna decision, the Railroad Commission was confronted with the difficult task of adopting rules and regulations for the Normanna Fields. The Railroad Commission obviously reached the conclusion that the Normanna decision could mean nothing other than compulsory pooling. On September 27, 1961, the Railroad Commission adopted new rules for the Normanna Fields. The Commission in its order took cognizance of two short paragraphs in the Normanna opinion wherein the Court

said that the 2/3-1/3 rule did not come close[1] to compelling ratable production and that the responsibility[2] was upon the Commission to devise some rule of proration which would conserve the gas in the field in question and at the same time be fair and just to all parties.

It should be noted that the Normanna opinion carefully avoided specifically directing the Railroad Commission to adopt a rule encompassing compulsory pooling. In fact, it gave no specific direction in this respect. However, the Commission was of the opinion[3] that compusory pooling was demanded by the Normanna decision. Rule 3b,[4] and other provisions in the special order is-

---

1. "It does not come close to compelling ratable production; neither does it offer each producer in the field an opportunity to produce his fair share of the gas from the reservoir."

2. "The responsibility rests with the Commission to devise some rule of proration which will conserve the gas in the field in question and at the same time be fair and just to all parties without depriving any of them of his property;"

3. "WHEREAS, From a study of the full record adduced at said hearing, which included technical reservoir data and legal briefs submitted by the several interested parties, the Commission is of the opinion and finds that an acreage allocation formula would reasonably provide each party an opportunity to produce its fair share of the gas in a reservoir, but because of the additional responsibility placed upon the Commission, that is, to arrive at a means of preventing confiscation of a small tract's reserves while allowing each operator to produce its fair share of the gas in a reservoir, as knotty a problem as has ever been placed before the Commission, must be solved, that such solution in all probability is best resolved through the use of a special allowable that would encourage a small tract owner to negotiate with his neighbors for fair and just treatment, but would also provide a sufficient allowable to such small tract to encourage a reasonable attitude in such neighbors so that they would endeavor to work out this common problem; * * *."

4. "Rule 3b. Any operator having the right to drill a gas well upon a tract containing less than 100 acres, after application, notice and hearing prior to the drilling of the well, may, if in the judgment of the Commission the facts so justify, be given a definite and fixed special allowable, provided the well is completed as a producing well, higher than the allowable that would be fixed for any well completed upon such tract by reference to said allocation formula upon proof to the Commission (1) that the drilling and completion of a well upon said tract is not economically feasible; and (2) that each and every owner of the right to drill upon acreage immediately adjacent to said tract of less than 100 acres has refused to allow the pooling of said tract with enough of said immediately adjacent acreage to create a drilling unit of at least 100 acres upon fair and reasonable terms, that is, upon such terms as would allow the owners to drill, complete and operate the well to be drilled thereon and as would provide that all income received from 7/8ths of the production from said well and all expense of drilling, completing and operating said well should be shared among the owners of the working interest in said drill-site unit upon an acreage basis. Such special allowable shall control the production of gas from said well during its producing life, except that said allowable shall be related properly to total field production as the same may fluctuate and said special allowable, if granted, shall in no event exceed the allowable of a gas well completed on a tract containing 100 productive acres; provided further, however, that any well drilled before the adoption of this rule will be treated, for purposes of this rule, as though it had not yet been drilled."

sued on September 27, 1961, strongly indicate that the Commission felt that this Court had by the Normanna decision released the Commission from the duty of following the well-settled rules of property which had been firmly announced by this Court in the decisions hereinafter cited.

The Halbouty decision confirms the action of the Commission of September, 1961. In other words, Halbouty said, in effect, to the Commission that it correctly concluded, in adopting the September, 1961 rules, that it had the authority under the Normanna decision to fix an allowable for wells on small tracts in the absence of statutes providing for compulsory pooling.

The Halbouty decision falls in line with the advocates of compulsory pooling and for the first time informs the litigants as to what the majority really had in mind when it wrote the Normanna decision. However, I wish to point out that even after Normanna, the advocates of compulsory pooling recognized that the Texas courts had definitely established the right of separate development. May I digress to say that we do not have before us here the question of whether or not the property rule prevailing in Texas has caused gross inequities. The question is: Are we going to depart from the Court's consistent adherence to the rule that a tract, no matter how small, is entitled to one well as a matter of right unless the tract is a part of a voluntary subdivision, and that the Legislature is the only body that can bring about compulsory pooling? It is well recognized that the Texas rule of property stands for the proposition that in Texas the owner of a small tract is entitled to one well as a matter of right and that to limit the allowable for that well to a figure commensurate with the recoverable *oil and gas in place beneath the tract* would make the well an unprofitable one and his right to drill a well on his tract would be a futile thing. This rule of property has been completely destroyed by the Halbouty decision, particularly when this Court said:

> "So far as the appellees' complaint that a striking down of the 1/3-2/3 formula would probably entail heavy financial loss to them, it may be said that they drilled their wells at their own risk. There is some indication in the record by bill of exception that they were offered unitization that would prevent confiscation and afford to them a fair share of the mineral proceeds from the common source. * * * "

Clearly, without statutory standards, the Railroad Commission cannot adequately exercise the power of compulsory pooling

now given to it by Halbouty. On the other hand, the owners of small tracts are left at the mercy of the standards fixed by the owners occupying the position of Halbouty and Henderson — this, without regard to whether the small tract owners are wealthy, middle class, or poor.

In this case, the offers to pool made by Halbouty and Henderson are most indefinite, this because there exists no legislative guide fixing the standards for determining how expenses and revenue is to be shared. Each operator who is fortunate enough to have gotten together several small tracts is left to make his own ground rules. This cannot be sound. For example, in this case, Halbouty offered to pool and unitize his leases with others, but all that his offer said on the subject of expenses was that Halbouty will "pay and bear his ratable share of the cost of drilling and operating costs". I think Dillon's argument on this particular phase of the case is sound and I quote:

"Does 'ratable' mean on the basis of surface acreage? If so, it would obviously be an unfair basis of pooling or unitization, if the thin leases of Halbouty on the east were unitized with tracts in the center of the field having very thick and productive sands. Or, on the other hand, does 'ratable' mean that the costs and revenue would be divided on the basis of estimated acre feet of net productive sand? If so, whose estimate is to be taken as the criterion? Must the Railroad Commission set up a schedule of acre feet, resolving the tremendous conflicts between experts as to how many acre feet are beneath the various tracts?

"To illustrate the difficulties, it may be pointed out that with reference to the Henderson-Doornbos No. 2 Unit, Halbouty's expert estimated that it had 420 acre feet, whereas Henderson's expert estimated that it had 1,760 acre feet, or an increase of 319% over the estimate of Halbouty's witness. Similarly, as to the Henderson-Doornbos No. 1 Unit, Henderson's expert gave his client's lease an estimated 2,165 acre feet, as compared to Halbouty's witness's estimate of 768 acre feet, or an increase of about 180%. Similarly, as to the Henderson-Montrose Unit, Halbouty's expert estimated that it had only 7,764 acre feet, whereas Henderson's expert estimated that it had 14,300 acre feet. In other words, Mr. Henderson's expert increased the estimate of Halbouty's expert by 84%.

"We assume, from what the Court has said, that the Railroad Commission must decide whether acreage, or acre feet,

or estimates of reserves in place, or some other standard will be the basis for allocating expenses and revenues among the owners of tracts which are forced to unitize and the Commission must resolve any conflicts between experts in estimating productive acreage or acre feet or reserves in place. Even though the owners of small tracts feel that their acre feet or reserves are being grossly underestimated, in relation to similar estimates for adjoining tracts, still they would have to accept whatever the Railroad Commission decides if they are to share in the pool or unit. Presumably, also, the large unit operators must accept the Commission's decision under the threat that, if they do not, the small tract owners will be allowed to produce enough gas to pay back costs plus some profit. In that event, we respectfully ask, if the large unit operators either refuse to pool or unitize or will not accept the decision of the Railroad Commission regarding their share of any proposed unit, by what legal authority is the Railroad Commission then empowered to authorize the owners of small tracts to go ahead and separately develop their tracts and receive an allowable which will permit them to drain more gas than they originally had in place? Is the legal test of 'confiscation' in such cases to be something other than the denial to the owners of large tracts of the right to recover the gas in place beneath their tracts?"

The right of separate development of small tracts, where the owners did not voluntarily pool with other tracts, has never been questioned in former decisions. Even though the Legislature in Article 6014, Vernon's Annotated Civil Statutes, gave the Railroad Commission broad authority to enact orders to prevent waste, the Legislature was very careful in paragraph (g) of this statute to expressly declare that it was not the intention of the Legislature to require repressuring of an oil pool or that the *separately owned properties in any pool be unitized under one management, control or ownership*. The Normanna decision is now being used as express authority from the Supreme Court of Texas to the Railroad Commission to ignore such cases as Ryan Consolidated Petroleum Corporation v. Pickens, supra; Pickens v. Ryan Consolidated Petroleum Corporation, Tex. Civ. App., 219 S.W. 2d 150, wr. ref. n.r.e.; Halbouty v. Darsey, Tex. Civ. App., 326 S.W. 2d 528, 532, wr. ref. n.r.e.; Nale v. Carroll, Tex. Civ. App., 266 S.W. 2d 519, 526, affirmed 155 Tex. 555, 289 S.W. 2d 743; Coates v. De Gracia, Tex. Civ. App., 286 S.W. 2d 691, 694; Section 1 of Article 6008b, Vernon's Annotated Civil Statutes; Dailey v. Railroad Commission, Tex. Civ. App., 133 S.W. 2d 219, wr. ref.; Stanolind Oil & Gas Company v. Railroad Commission,

Tex. Civ. App., 96 S.W. 2d 664, no wr. hist.; Nash v. Shell Petroleum Corporation, Tex. Civ. App., 120 S.W. 2d 522, wr. dism.; Railroad Commission v. Delhi-Taylor Oil Corporation, Tex. Civ. App., 302 S.W. 2d 273, wr. ref. n.r.e.; Halbouty v. Darsey, Tex. Civ. App., 331 S.W. 2d 835, no wr. hist.; Atlantic Refining Company v. Railroad Commission, Tex. Civ. App., 330 S.W. 2d 494, wr. ref. n.r.e.; Railroad Commission v. Humble Oil & Refining Company, 151 Tex. 51, 245 S.W. 2d 488.

My contention is simply this: The statutes now in effect do not compel unitization. Therefore, the Railroad Commission has no legal authority to enter orders which would have the effect of requiring or compelling unitization. This very argument was persuasive and no doubt caused this Court in the Ryan case to adopt the view as expressed in the final majority opinion that without legislation requiring compulsory pooling, the Court had no power to enact such legislation. Thus, the Court adhered to the separate tract development theory under the well-settled rule of property. In the Ryan case, we discussed the fact that the State of Mississippi and other states had adopted unitization and pooling statutes, but expressly held that the rule of capture "has become a vested property right" and the "Legislature of Texas has not seen fit to enact legislation which would authorize the Railroad Commission to adopt and promulgate rules which would have the effect of rendering ineffective the rule of capture recognized in all the decisions in this State." The opinion of the majority in the present case, nullifying the proration order in the Port Acres Field, does exactly what the Ryan case said the Legislature of Texas has not seen fit to do. It not only authorizes, but it even requires the Railroad Commission to adopt and promulgate rules which would have the effect of rendering ineffective the rule of capture as recognized in all previous decisions in Texas. It cannot be said that the Ryan case was decided without due regard to all the problems we have presented in the present case. It was argued in the Ryan case that the majority opinion in that case permitted the confiscation by Pickens & Coffield of minerals belonging to Ryan. The dissenting opinion stressed the contention that the majority opinion was based primarily on the rule of capture and strongly urged that Ryan was entitled to equitable relief to the extent that it should share in the ownership of all oil produced from Pickens and Coffield's land and that to allow the rule of capture to prevail would amount to an unconstitutional confiscation of Ryan's property, the theory being that "under our law no one has a right simply to capture the property of someone else". This Court rejected that theory. We said:

"Petitioner's [Ryan] contention that this cause is one for equitable relief should not be sustained for the further reason that its position is inconsistent with the law of capture, which is a well-settled rule of property in this jurisdiction. The rule of capture is simply this — that the owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, though part of such oil or gas may have migrated from adjoining land. The Railroad Commission is without power from the Legislature * * * to do anything * * * ."

We rejected the State of Mississippi authorities primarily on the ground that our Legislature had not adopted statutes to "safeguard, protect and enforce the co-equal and correlative rights of owners in a common source or pool of oil and gas to the end that each such owner in a common pool or source of supply of oil and gas may obtain his just and equitable share of production therefrom * * * ."

I still say, as we said in Ryan, that the Legislature of Texas has not seen fit to enact legislation which would authorize the Railroad Commission to adopt and promulgate rules which would have the effect of rendering ineffective the rule of capture recognized in all the decisions in this State. The majority, on the other hand, now refuses to consider the physical facts with regard to "the peculiar characteristics of oil and gas", which has been established. See Brown v. Humble Oil & Refining Company, 126 Tex. 296, 83 S.W. 2d 935, 87 S.W. 2d 1096. Justice Wilson, the writer of the dissent in Ryan, said that the principles of geology and reservoir dynamics then known upheld his view and would eventually meet "with the same acceptance in judicial thought that they are accorded in business and financial thinking". We rejected such thinking then and should do so now. I agree with Dillon et al when they say, in their motion for rehearing, that the present decision in this case creates immediately many complex problems and, in the absence of legislation on the subject, leaves the Railroad Commission without a proper standard to be used in discharging its duties so far as oil and gas is concerned. The motion points out some of these problems, such as:

"For example, exactly what does the Court mean when it says in its opinion (page 16) that 'the landowner is not restricted to the particular gas that may underlie his property *originally* but is the owner of all which he may legally recover'? What is the test of what an owner can 'legally recover'? Is it the *equivalent* of the gas which was *originally in place* beneath his tract? If so, must he stop producing his well when he has

recovered such amount of gas, even though the reservoir beneath his tract has by that time been again refilled by gas which has been drained from other properties?

"For example, every witness who testified in this case said that the appellant, Halbouty, would recover under the present proration formula *substantially more than 100%* of the recoverable gas originally in place beneath his lease, and it was admitted in Halbouty's main brief in this Court that he will recover over 26% of the field reserves, whereas it is estimated that his leases have only 22% of the field reserves under them. Must Halbouty stop producing when he has recovered 100% of the original reserves in place beneath his units? If he produces more than this, is he liable to Henderson for excessive drainage, since Henderson will suffer by excessive drainage to Halbouty's tracts (meaning by 'excessive' an amount exceeding the gas originally beneath the Halbouty leases)?" [Emphasis added.]

I agree with Dillon et al when they say:

"Increased knowledge of engineering and geological facts about oil and gas reservoirs has not changed the fundamental nature of oil and gas as fluid substances which move in the reservoir, without regard to property lines, in response to pressure differentials, which are established by either natural or artificial forces. Where and how and to what extent such movements will take place cannot be predicted with certainty even now, particularly where wells are spaced widely apart and only estimates or intelligent guesses can be made as to the condition of the reservoir in the large undrilled areas between the wells. To apply, as the Court apparently has done in the opinion in this case, the same rules of property to oil and gas which are applied to solid minerals, is not only an abandonment of established rules of property but also an attempt to ignore fundamental physical facts."

There is no sound reason for the abandonment of the rules of property which have been long established in Texas. No previous decision has held that the Railroad Commission must deny a living allowable to a first well on a separate tract. The Dillons et al., and other small tract producers in the Port Acres Field, have spent millions of dollars in drilling costs alone. If this decision is permitted to stand these people cannot possibly recover their costs because the allowables for such wells will be limited so far below their producing capacity that they can recover only the

equivalent of the gas in place beneath each tract. No previous decision, including the Normanna decision, has intimated, much less held, that the Railroad Commission would be required to cut the allowables of the many Port Acres wells to the point where they could recover only a very small fraction of their cash investment. In the Normanna case, the Court indicated only that the predicted net profit to the Bright & Schiff well was unreasonably high. I think everyone will agree that the Normanna case was revolutionary, but, at the same time, there was nothing even in that case indicating that the Railroad Commission would be required to destroy the investments of the owners of wells lawfully drilled upon separate tracts. In this connection, I concurred in the result reached in the case of Railroad Commission of Texas et al v. Murel Williams, 163 Tex. 370, for the reasons stated in a concurring opinion delivered on April 11, 1962. I concurred in the result only for the reason that, in my opinion, the Court in the Williams case was lending encouragement to the advocates of compulsory pooling in their effort to effectively destroy the rules of property heretofore announced and followed by The Supreme Court of Texas.

In my opinion the allocation formula attacked in this case is reasonably supported by substantial evidence. The District Court correctly excluded the testimony of Commissioner Murray.

I agree with Dillon et al. when they say:

"The proration orders attacked in this case are legislative orders, in that they apply generally to all producers in the Port Acres Field and are prospective in operation. Therefore tests which would apply to judicial or quasi-judicial decisions cannot properly be applied to the proration orders involved in this case. Certainly no one would contend that a statute could be attacked on the ground that the legislators voting for the statute had previously committed themselves, by agreements among themselves or otherwise, to a policy embodied in the statute, before it was passed. The only question would be whether the statute, based on evidence heard by the Court, is or is not in conformity with constitutional requirements. So, it is submitted, in this case, where a legislative order of the Railroad Commission is concerned, the Court should not inquire into the policies, motives, or methods of the Commission which caused it to adopt this formula rather than some other."

A helpful discussion of the scope of judicial review of oil and gas orders of the Railroad Commission is contained in the opinion

in Railroad Commission v. Magnolia Petroleum Company, 130 Tex. 484, 109 S.W. 2d 967. That case refers to and quotes from the opinion in Railroad Commission v. Galveston Chamber of Commerce, 105 Tex. 101, 145 S.W. 573.

The same rule announced in the above cases was more recently stated by this Court in Railroad Commission v. Houston Natural Gas Corporation, 155 Tex. 502, 289 S.W. 2d 559, 573:

"Earlier in this opinion we pointed out that where the attack upon a legislative act of the Railroad Commission is that it violates the Constitution because it is confiscatory, we would not 'investigate the methods adopted by the Commission in fixing its rates, nor the motives or purposes which prompted such action'. Railroad Commission v. Galveston Chamber of Commerce. 105 Tex. 101, 145 S.W. 573, 580. The Commission may have used altogether erroneous methods and an erroneous conception of the law but if it arrived at a correct rate — and the court will test this rate against its own finding of fact — then the rate should be sustained."

The courts should simply test the validity of the order involved here on the basis of whether it is supported by substantial evidence. There is no logical reason why the Railroad Commission should be restrained from continuing in effect the allocation formula adopted August 18, 1958, for the Port Acres Field. I would affirm the judgment of the trial court.

Opinion delivered May 23, 1962.